In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3198

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

NAPOLEON FOSTER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 880—**Robert W. Gettleman**, *Judge.*

ARGUED APRIL 7, 2011—DECIDED JULY 21, 2011

Before CUDAHY, MANION, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Appellant Napoleon Foster was found guilty of orchestrating an armed robbery of a credit union and related firearms charges. He was sentenced to 284 months in prison. On appeal, Foster raises numerous challenges to his convictions and sentence. First, he argues that his jury was not selected in the manner required by Federal Rule of Criminal Procedure 24. He then argues that inadmissible propensity

evidence and several hearsay statements were admitted against him. Foster also argues that the evidence was not sufficient to show that the credit union was federally insured at the time of the robbery, and that he could not be convicted as a felon in possession of a firearm because Illinois had allegedly restored his civil rights after his last term of imprisonment. Finally, Foster contends that he should not have been sentenced as an armed career criminal. Finding no reversible error, we affirm Foster's convictions and sentence.

I. *The Robbery and Factual Background*

On January 19, 2006, two armed and masked people robbed the Acme Continental Credit Union in Riverdale, Illinois. They made off with about $250,000 in cash, aided by an accomplice who drove their getaway car. Law enforcement eventually identified Asia Hill and Charles Anderson as the masked robbers and appellant Napoleon Foster as their getaway driver. Foster was arrested and charged with armed robbery of a financial institution in violation of 18 U.S.C. § 2113(a) & (d), possession of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A), and possession of a firearm after being convicted of a felony in violation of 18 U.S.C. § 922(g)(1).

Asia Hill was the prosecution's star witness at trial, having agreed to testify against Foster in exchange for leniency. According to Hill, Foster had suggested that they rob the credit union because he had done business there for some time and was familiar with the building

layout and the employees. Foster knew how many employees worked in the credit union and who carried the vault key. He knew that the credit union was unguarded and that one employee owned a truck ideally suited for a getaway. Hill also testified that Foster had agreed to provide two firearms for use in the robbery.

Foster did not want to go inside the credit union himself. He feared that he might be recognized. He decided that he and Hill should recruit two additional accomplices to carry out the robbery. Hill recruited her friend Charles Anderson, a man she described as "a small-time drug dealer" in need of money, who in turn recruited his friend Randy Williams.

Initially, the plan was for Anderson and Williams to go inside the credit union while Hill and Foster waited behind in a getaway car that Williams agreed to provide. On the day of the robbery, however, Williams never showed up. Hill agreed to go into the credit union in his place. Foster then drove Hill and Anderson to the credit union, dropped them off, and drove a short distance away to wait for them. Anderson and Hill wore masks. Hill carried a .38 revolver, and Anderson had a sawed-off shotgun, both provided by Foster. Once inside the credit union, Hill had a teller empty the cash drawers while Anderson emptied the vault. After they had taken all the money they could carry, they fled in a car stolen from one of the credit union's tellers.

Hill and Anderson met up with Foster a short distance from the credit union and abandoned the stolen car. Foster then drove them back to Hill's apartment in

Indiana to count the money from the heist. Out of approximately $250,000 stolen from the credit union, Hill testified, Foster took the largest share of $100,000. Hill and Anderson split what remained.

Anderson also testified pursuant to a plea agreement. Anderson corroborated much of Hill's previous testimony, admitting that he and Hill were the masked robbers and claiming that Foster had provided the guns, the inside information about the credit union, and the getaway car. Because Foster had planned the robbery, Anderson testified, he took $100,000 of the stolen money for himself while Anderson and Hill took smaller shares.

Foster did not testify in his defense. The jury convicted him on all three counts. At sentencing, the district court concluded that Foster's past criminal record qualified him as an armed career criminal and sentenced him to 284 months in prison. This appeal followed.

## II. *Jury Selection — Federal Rule of Criminal Procedure 24*

Foster's primary argument on appeal is that the jury selection process violated Rule 24 of the Federal Rules of Criminal Procedure. After the entire jury panel was questioned, the parties exercised their challenges for cause against the entire panel. The parties then exercised their peremptory challenges, including a number of extra challenges granted by the district court, against the remaining members of the panel as a whole. Twelve remaining members of the panel were then selected at random and seated on the jury, and two more were selected at random and seated as alternates.

On appeal, Foster raises two distinct issues. First, Foster and the government agree that the district court's process for selecting the alternate jurors failed to comply with Rule 24(c)(4) of the Federal Rules of Criminal Procedure. That rule provides additional peremptory challenges to be exercised specifically against prospective alternate jurors, the number of which is based on the number of alternates the court intends to seat. Fed. R. Crim. P. 24(c)(4). "These additional challenges may be used *only* to remove alternate jurors." *Id.* (emphasis added).

Although a district court has substantial discretion regarding how it conducts the jury selection process, compliance with the explicit requirements of Rule 24 is not a matter entrusted to the court's discretion. *United States v. Mendoza*, 510 F.3d 749, 753 (7th Cir. 2007), citing *United States v. Delgado*, 350 F.3d 520, 524 (6th Cir. 2003). Here, the district court granted the parties extra peremptory challenges for use against the entire panel, but did not provide the required additional challenges that could be used only to remove alternate jurors. See *United States v. Patterson*, 215 F.3d 776, 780 (7th Cir. 2000) (finding same district judge's method of selecting alternate jurors violated Rule 24(c), but finding error harmless), vacated in part on other grounds, 531 U.S. 1033 (2000).

The second jury selection issue challenges the district court's decision to have the parties exercise their peremptory challenges without knowing the seating priority of the panel members. Foster complains

that the random selection of the panel members who had survived the for-cause and peremptory challenges diluted his ability to maximize the value of his peremptory challenges. If he had known the order in which the panel members would be seated on the jury, he argues, he could have focused his peremptory challenges on those jurors with the highest seating priorities and whose impartiality he doubted.

The text of Rule 24 provides for questioning of prospective jurors and for the exercise of peremptory challenges. With the exception of the separate peremptory challenges for alternate jurors, however, Rule 24 leaves a good deal of discretion to a district court as to the details. At the most basic level, Rule 24 does not specify a choice between the "struck jury" or "jury box" systems for selecting juries and exercising peremptory challenges, or for choosing among the many variations on them. For a useful summary of the two major systems and the important variables in the details, see Roger Allan Ford, *Modeling the Effects of Peremptory Challenges on Jury Selection and Jury Verdicts*, 17 Geo. Mason L. Rev. 377, 383-87 (2010) (reviewing debate on different procedures, including available empirical evidence); Kathleen M. McKenna, *Current Developments in Federal Civil Practice*, 821 PLI/Lit. 581, 587-89 (2010). Each method has its supporters and detractors. Over the past generation, however, the ability to challenge an opponent's exercise of peremptory challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny has tilted the balance in favor of the struck jury system, which allows the court to evaluate all peremptory challenges before any struck jurors have been sent home.

Trial lawyers' and judges' opinions about the important variables in jury selection procedures are often firmly held. From the perspective of parties and their lawyers, a critical consideration is how much information they have about the effects of any specific peremptory challenge. How likely is it that a particular juror will be selected if not struck, or is that likelihood simply unknown? If that particular juror is struck, what is known about the likely replacement — is that possible replacement even more biased against the defendant than the person struck? See Ford, *supra*, at 387 (noting that whether jury pool is placed in a specific order before attorneys exercise their challenges is both "frequently discretionary" and important to jury selection outcomes). However important these details may be to the parties, the important thing for our purposes is that Rule 24 leaves these details of jury selection to the discretion of the district judge. We specifically rejected in *Patterson* the argument that the accused in a criminal case is entitled to make maximum strategic use of the peremptory challenges. 215 F.3d at 780.

We dwell no further on the details of the procedures used to select the jurors and their alternates because Foster explicitly waived the protections of those procedures. As the Supreme Court has explained, the provisions of the Federal Rules of Criminal Procedure are "presumptively waivable." *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995). Here, Foster waived any challenge to the jury selection process by agreeing explicitly in advance to the procedure used by the district judge. See *United States v. Hill*, 552 F.3d 541, 544-45 (7th Cir. 2008)

(finding defendant waived objection to same Rule 24(c) violation in selection of alternate jurors). In an on-the-record pretrial conference and at trial, the district judge explained the manner in which he planned to conduct voir dire and asked the parties if they agreed to that procedure. Both defense counsel and the prosecution agreed without reservation.[1] Foster did not raise his present argument until after he was found guilty. Having waived any error that may have occurred here, Foster cannot now complain of the manner in which his jury was selected.

We also decline Foster's invitation to exercise our supervisory power and reverse his conviction to coax the district court into complying with Rule 24 and our precedent interpreting that rule. By proceeding with voir dire only after carefully ensuring that both parties had waived the requirements of Rule 24, the district court did not reveal disregard of our prior rulings, but rather acknowledged that those rulings forbade it from proceeding absent the parties' consent. We are confident that both the district courts and the prosecutors in this circuit are well aware that the validity of convictions obtained after violations of Rule 24 may well depend upon the validity of such waivers and will take whatever steps are necessary to ensure that any such waivers are valid.

---

[1] Contrary to Foster's insistence on appeal, nothing in the record indicates that his defense counsel was confused or misinformed.

III. *Evidentiary Issues*

Foster next argues that several evidentiary rulings require reversal. He argues first, that the government's evidence regarding his involvement in a fraudulent check-cashing scheme was inadmissible under Federal Rule of Evidence 404(b); second, that a conversation recorded between Anderson and Williams after the robbery was inadmissible hearsay; third, that he was denied an opportunity to cross-examine a witness who identified him in a photographic array; and fourth, that one of his defense exhibits was not provided to the jury until after closing arguments had begun. We review these evidentiary issues for a possible abuse of discretion, unless Foster failed to object at trial, in which case our review is only for plain error. *United States v. Tanner*, 628 F.3d 890, 901 (7th Cir. 2010).

A. *Rule 404(b) Evidence Regarding Check Fraud Scheme*

Before trial, the government moved *in limine* for permission to introduce evidence that, prior to the Acme robbery, Foster had participated with Hill in a fraudulent check-cashing scheme. The government argued that the check-cashing scheme was inextricably intertwined with the Acme robbery because the evidence concerning the scheme showed "why defendant Foster chose to commit [the] robbery in the first place" and "how the criminal relationship between Asia Hill and Napoleon Foster developed, why Foster was involved in the robbery, and how Charles Anderson evolved from Asia Hill's companion to Foster's criminal

associate." In the alternative, the government asserted that the check-fraud evidence was admissible under Rule 404(b) because it would "show how the criminal relationship between defendant and Hill developed, and place[ ] Hill's recruitment of Anderson in context by explaining Hill and Foster's motive for participating in the Acme Credit Union robbery." Over Foster's objection, the district court granted the government's motion on the grounds that the Acme robbery was "intricately related to the alleged failed check cashing scheme" and that evidence of the check-cashing scheme "explains the relationship among the alleged co-conspirators and the origin of the charged scheme to rob a [credit union]."

At trial, the government presented extensive testimony regarding the check-cashing scheme. On direct examination, Hill explained that she had first met Foster when he recruited her to assist him in a fraudulent check-cashing scheme. According to Hill, Foster used passport photos to create fake employee identification cards, which Hill would then use to cash forged corporate payroll checks. Hill gave any money she received to Foster, who paid her approximately $600 for every check she cashed. Hill claimed, however, that by late December 2005 or early January 2006, she told Foster that she wanted out of the check-cashing scheme. Cashing the checks was too time-consuming, she said, and she was nervous about the risk she took every time she cashed a forged check, especially since those checks were in her name and she received so little money from each check. According to Hill, Foster responded by asking her if she was interested in helping him rob

Acme, a credit union at which he had "done business for some years."

The check-cashing evidence was not limited to Hill's testimony. Anderson also testified that, when Hill recruited him to help rob Acme, she claimed to know Foster from her prior involvement in the check-cashing scheme. Anderson claimed that Hill had told him that Foster "would get the checks and make the checks out," while Hill "was responsible for cashing the checks." Hill had decided not to continue cashing those checks, Anderson explained, which was "why we were talking at that point about the robbery."

The chief financial officer of a victim of the scheme also testified. He told the jury that, in September 2005, it came to his attention that fraudulent checks were being cashed against his company's bank account. After an internal audit, the CFO said, he learned that "about five checks [had] cleared in amounts different than we had recorded." An investigation by the company's bank revealed that the checks had been cashed against an account used to pay vendors, not a payroll account. The CFO also identified a number of the fraudulent checks that Hill had cashed against that account, none of which had been authorized by the company. Those checks, the CFO explained, were in fact duplicates of legitimate checks issued in different amounts to different individuals.

In granting the government's pretrial request to place this evidence before the jury, the district court relied on a theory of "inextricable intertwinement" that complied with the law of this circuit at the time. After

the trial in this case, however, we barred resort to that theory on the ground that it had become "overused, vague, and quite unhelpful." *United States v. Gorman*, 613 F.3d 711, 719 (7th Cir. 2010). Instead, we instructed district courts to consider whether such evidence would be admissible either under Rule 404(b) or as direct evidence of the charged offense. *Id.* (affirming conviction because "inextricably intertwined" evidence was properly admissible as relevant evidence).

What to do now with a trial conducted under the pre-*Gorman* law? From the district judge's explanation under our now-abandoned "inextricably intertwined" concept, we think it is clear that the judge would have admitted this evidence under Rule 404(b) if he had anticipated our about-face. See *United States v. Conner*, 583 F.3d 1011, 1019 (7th Cir. 2009) (observing before *Gorman* that we will uphold rulings applying the inextricably intertwined doctrine if the evidence at issue is admissible under Rule 404(b)). Under Rule 404(b), evidence detailing "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but such evidence is admissible for other purposes. When determining whether evidence is admissible for another purpose, we ask whether (1) the evidence was offered for some purpose other than to show the defendant's criminal propensities; (2) the other act is similar enough and close enough in time to the charged crime to be relevant to that stated purpose; (3) the evidence presented was sufficient to support a finding that the defendant committed the prior act; and (4) the probative value of the proffered evidence is not substan-

tially outweighed by the danger of unfair prejudice. *United States v. Hicks*, 635 F.3d 1063, 1069 (7th Cir. 2011).

As to the first element, the check-cashing scheme was not offered as propensity evidence. The check-cashing evidence showed the origin of Foster's relationship with Hill. It helped explain his trust of her in carrying out the robbery and the evolution of their relationship from check fraud to armed robbery.[2] The evidence helped explain why Foster would have approached Hill, of all people, with his plan to rob Acme: the two knew one another well not merely in a social setting but in an ongoing criminal relationship. See *United States v. Taylor*, 522 F.3d 731, 734 (7th Cir. 2008) (noting that the fact that a defendant's criminal associates "had dealt with him previously could explain how they were able to identify him . . . and why he was willing to deal with them").

On the second element, Foster insists that check fraud is so different from armed robbery that this evidence could not have been admitted against him under Rule 404(b).[3] Foster cites cases in which we have held prior bad acts inadmissible because they bore too little

---

[2] To the extent Foster tries to argue that this purpose is not among those listed in Rule 404(b), we note that the exceptions listed in that rule "do[ ]not exhaust the purposes for which evidence of other wrongs or acts may be admitted." *United States v. Jordan*, 722 F.2d 353, 356 (7th Cir. 1983).

[3] Foster does not argue that his prior acts were not close enough in time to be admissible under Rule 404(b).

similarity to the offense charged. *E.g.*, *United States v. Hudson*, 843 F.2d 1062, 1066 (7th Cir. 1988) (finding an abuse of discretion where "government did not in any way establish that the . . . robbery was similar in nature to the charged crime"). But the fact that certain Rule 404(b) evidence is admissible or not in one case does not mean that the same result will be called for in a subsequent case:

> [Q]uestions about "how similar is similar enough" . . . do not have uniform answers; these answers . . . *depend on the theory that makes the evidence admissible*, and must be reached on a case-by-case basis. Thus, similarity means more than sharing some common characteristics; the common characteristics *must relate to the purpose for which the evidence is offered*.

*United States v. Torres*, 977 F.2d 321, 326 (7th Cir. 1992) (emphases added); *United States v. Vargas*, 552 F.3d 550, 555 (7th Cir. 2008) (explaining that "we analyze whether the prior conduct is similar enough on a case-by-case basis, a determination that 'depend[s] on the theory that makes the evidence admissible'"), quoting *United States v. Wheeler*, 540 F.3d 683, 692 (7th Cir. 2008). This is why such a high degree of similarity is required when Rule 404(b) evidence is offered to prove *modus operandi*, *United States v. Smith*, 103 F.3d 600, 603 (7th Cir. 1996), while less similarity is required when such evidence is offered for other purposes, see *United States v. Wheeler*, 540 F.3d 683, 692 (7th Cir. 2008).

Because the evidence of Foster's prior check fraud was offered to show that he had a criminal relationship

with Hill that eventually gave rise to the plan to rob Acme, Rule 404(b) requires little similarity between the check fraud and the subsequent robbery. See *Vargas*, 552 F.3d at 555; *Torres*, 977 F.2d at 326. As our cases explain, the comparison of Foster's prior acts to the charged crimes "need not be unduly rigid," but rather should be "directed at establishing the relevancy of the 404(b) evidence." *United States v. Lloyd*, 71 F.3d 1256, 1264-65 (7th Cir. 1995) (emphasis omitted). Here, the evidence showing that Foster suggested the robbery after Hill decided that she no longer wanted to cash fraudulent checks was relevant in essentially the same way as would have been evidence showing that Foster and Hill were old friends or close relatives: it explained why Foster trusted Hill, of all people, to help carry out the Acme robbery. Given the purpose for which this evidence was offered, the similarity prong of the Rule 404(b) analysis is of exceedingly minimal significance. See *Hicks*, 635 F.3d at 1069 (stating that Rule 404(b) requires only that the charged crime and the other act be "similar enough and close enough in time to be relevant to the matter in issue"). The significant differences between check fraud and armed robbery do not undermine the check fraud scheme's relevance to the government's argument that the robbery represented an escalation of Foster's and Hill's criminal relationship.

The third element of Rule 404(b) analysis requires that the evidence be sufficient to prove Foster's involvement in the check-cashing scheme by a preponderance of the evidence. *United States v. Reyes*, 542 F.3d 588, 592 (7th Cir. 2008). Given the extensive evidence and testimony pre-

sented at trial — Hill testified at length regarding Foster's role in the check-cashing scheme, and the victim's CFO confirmed that his company had been the victim of that scheme — there can be little doubt that the government met this burden.

The final element of our analysis requires that we consider whether the prejudicial value of the evidence substantially outweighed its probative value. *Hicks*, 635 F.3d at 1069. Central to this determination is whether, in context, the evidence's "prejudicial impact is substantial in relation to the evidence's probative value." *Tanner*, 628 F.3d at 902. "[T]he more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote." *United States v. Torres*, 977 F.2d 321, 328 (7th Cir. 1992).

The testimony from Hill and Anderson about the check-cashing scheme was sufficiently probative regarding Hill's relationship with Foster to overcome any unfairly prejudicial effect of that evidence. Although the question is closer, we also see no error, given the government's theory of admissibility, in admitting testimony from one victim of the check-cashing scheme. The government had to prove the scheme by at least a preponderance of the evidence. The victim provided a witness who was, unlike Hill and Anderson, not a confessed bank robber and was not burdened with the credibility problems usually associated with confessed felons.

Even if the victim's testimony went into more detail about the check-fraud scheme than we might ourselves

think necessary with the benefit of hindsight, we see no abuse of discretion or reversible error. The jury heard extensive testimony from two of Foster's alleged accomplices, both of whom named Foster as their getaway driver and the man who planned the Acme robbery and took the largest share of the proceeds. Much of the check-cashing evidence — specifically, Hill's and Anderson's testimony explaining how the check fraud scheme evolved into a plan to rob Acme — was properly admitted under Rule 404(b). Given the strength of the case against Foster, we believe the relatively modest quantity of evidence provided by the victim had no meaningful effect on the jury's verdict on the bank robbery and firearm charges. See, *e.g.*, *United States v. Robinson*, 8 F.3d 398, 411 (7th Cir. 1993) (explaining that "a non-constitutional error is harmless if . . . it did not substantially affect the jury's decision"); see also *Tanner*, 628 F.3d at 903 (finding no reversible error where portion of testimony inadmissible under Rule 403 was "cumulative" and "not so prejudicial relative to the extremely strong evidence of [the defendant's] guilt").

### B. *Hearsay Objections*

Over Foster's pretrial objection, the district court admitted into evidence certain out-of-court statements made by Anderson and Williams concerning the Acme robbery. At trial, Anderson testified that he and Williams had gotten together some time after the Acme robbery to drive around and to "look[ ] for locations . . . to go out and rob." As they drove around, Anderson told

Williams about his involvement in the Acme robbery. Unbeknownst to Anderson at the time, Williams was recording the entire conversation for the FBI. During Anderson's testimony, the district court admitted into evidence the recording and portions of a transcript and allowed the government to play parts of the recording for the jury. Foster argues that the recording and transcript were inadmissible hearsay and that their admission violated his Sixth Amendment right to confrontation because Williams did not testify at trial.[4]

We analyze each declarant's statement separately for the purposes of hearsay analysis. See *United States v. Tolliver*, 454 F.3d 660, 665-66 (7th Cir. 2006). Under Rule 801(d)(1)(B), an out-of-court statement is excluded from the hearsay rule if (1) that statement is consistent with the declarant's trial testimony; (2) the party offering that statement did so to rebut an express or implied charge of recent fabrication or improper motive against the declarant; (3) that statement was made before the declarant had a motive for fabrication; and (4) the declarant testifies at trial and is subject to cross-examination. *United States v. Fulford*, 980 F.2d 1110, 1114 (7th Cir. 1992), citing *United States v. Lewis*, 954 F.2d 1386, 1391 (7th Cir. 1992).

Foster challenges only the second element of this test, which was undoubtedly satisfied here. Foster clearly

---

[4] Because we find no error on these issues, we decline to resolve the parties' dispute over whether plain error review is appropriate here. See *Tanner*, 628 F.3d at 901 n.2.

implied in his opening statement that Anderson would lie about Foster's involvement in the robbery in order to curry favor with the government. By implying that Anderson's plea agreement gave him an incentive to lie, Foster opened the door to the admission of Anderson's prior consistent statements on direct examination, before Foster had an opportunity to challenge Anderson's credibility on cross-examination. See *United States v. Cherry*, 938 F.2d 748, 756 (7th Cir. 1991) (holding witness's prior consistent statement admissible in part because defense counsel implied during opening statement that witness had fabricated her testimony); *United States v. LeBlanc*, 612 F.2d 1012, 1017 (6th Cir. 1980) (holding witness's prior consistent statement admissible where defense counsel implied in his opening statement that witness "should not be believed because of the favorable consideration he received from the government in his plea bargaining agreement"). Anderson's prior consistent statement was not hearsay under Rule 801(d)(1)(B), and the district court did not err.[5]

---

[5] We do not consider Foster's additional arguments concerning the application of Rule 801(d)(1)(B), all of which Foster raised for the first time in his reply brief. See *United States v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court."). Foster has also waived any challenge to Williams' part of the recorded conversation by failing to develop this argument sufficiently on appeal, both factually and legally. *E.g.*, *United States v. Collins*, 604 F.3d 481, 487 n.2

(continued...)

C. *Photographic Identification*

Foster's next challenges the application of another exception to the hearsay rule to out-of-court statements identifying a particular person. The evidence at issue here is a photographic array admitted as proof that Foster owned the black Cadillac used in the Acme robbery and that Foster was with Hill on the day of the robbery. At trial, Daniel Kotlajich testified that he had sold a black Cadillac to Foster in October 2005. He identified the bill of sale and vehicle title that Foster had signed in that sale. Kotlajich also testified that Foster had accompanied Hill when she purchased a black Oldsmobile from Kotlajich on the day of the Acme robbery.

Unfortunately for the prosecution, Kotlajich could not identify Foster at trial. Kotlajich did say, however, that when previously shown a photographic array, he was able to identify the man who had purchased the black Cadillac and who had accompanied Hill when she purchased the black Oldsmobile. He testified that he had initialed the photo of the man he identified in that array.

The government later called FBI Special Agent Lori Warren, who testified that she had spoken to Kotlajich

---

[5] (...continued)
(7th Cir. 2010). In any event, our review of the record indicates that Williams' statements were offered not for their truth but only to provide the context necessary to allow the jury to make sense of Anderson's admissible side of the conversation. See *United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002).

and shown him a photo array that included a photo of Foster. According to Agent Warren, Kotlajich had identified and initialed Foster's photo in that array. The government then offered the photo array into evidence. Foster objected on the ground that he had not been able to cross-examine Kotlajich regarding that array. The district court agreed that Foster had not been given sufficient opportunity to cross-examine Kotlajich about the photo array, but overruled that objection after granting Foster the opportunity to recall and cross-examine Kotlajich during his case-in-chief. Foster never took advantage of that opportunity to recall Kotlajich, however, and rested his case without calling any witnesses in his defense.

Federal Rule of Evidence 801(d)(1)(C) excludes a statement from the definition of hearsay if the declarant "testifies at trial . . . subject to cross-examination concerning the statement and the statement is . . . (C) one of identification of a person made after perceiving the person. . . ." Under this rule, Kotlajich's out-of-court identification of Foster was admissible non-hearsay so long as Kotlajich testified at trial and was subject to cross-examination concerning that identification. The Third Circuit has explained:

> Debate on the 1975 amendment to [Rule 801(d)] demonstrates [that] Congress was aware that third parties would testify to the witness's prior statements. See 121 Cong. Rec. 31,867 (1975) (statement of Rep. Hungate) ("The bill . . . applies to situations where an eyewitness has previously identified a person out of court. It would admit into evidence testimony of

that identification. For example, testimony by a police officer that at a lineup John Doe identified the defendant as the man who robbed his store.").

*United States v. Brink*, 39 F.3d 419, 426 (3d Cir. 1994). So long as the requirements of Rule 801(d)(1)(C) are met, government agents may testify about a prior statement of identification made by a witness who "identified the defendant in a lineup or photospread, but forgets, or changes, his testimony at trial." *Id.*; see, *e.g.*, *United States v. O'Malley*, 796 F.2d 891, 898-99 (7th Cir. 1986) (allowing FBI agent to testify regarding witness's prior identification of defendant after witness recanted at trial).

The better course, obviously, is to provide the photo array or other evidence of the prior identification immediately, while the declarant is still on the witness stand. But events at trial sometimes make the better course impractical. In such circumstances, a meaningful opportunity to cross-examine a declarant regarding his prior identification is enough to satisfy the requirements of Rule 801, even if the defendant chooses not to use the opportunity. See *United States v. Elemy*, 656 F.2d 507, 508 (9th Cir. 1981) (holding that FBI agent's testimony regarding witness's prior identification was admissible where nothing in the record suggested that the declarant was unavailable for reexamination after the agent's testimony). The district court provided Foster such a meaningful opportunity to cross-examine Kotlajich when it granted Foster permission to recall Kotlajich as a witness to pursue this matter further.

D. *Evidence of Foreclosure on Foster's Home*

Foster complains that one of his exhibits was not presented to the jury during his case-in-chief. During a jury recess after the government rested its case, Foster offered into evidence an exhibit showing that his mortgaged home had gone into foreclosure some time after his alleged participation in the Acme robbery. The court admitted this exhibit into evidence without objection from the government. When the jury returned from its recess, however, neither the court nor defense counsel told the jury that any exhibit had been offered into evidence in its absence. Instead, the court told the jury that the parties had rested and allowed the government to begin its closing argument.

Almost immediately, Foster requested a sidebar conference and told the court that his exhibit had never been published to the jury. The district court then told the jury:

> When I said "both sides rested," we had been doing some work when you were out for your lunch break, and during that time the defense offered some exhibits into evidence which were accepted into evidence and that they will address during their case. And that was part of their case. The rule is that you ordinarily don't offer exhibits except during your own case. They used that opportunity when you were out to offer those exhibits which are in. So you'll hear them discuss that during their closing arguments.

As the district court promised, Foster highlighted this exhibit during his closing argument, arguing that if he

really had stolen $100,000 from Acme, he could have saved his home from foreclosure.

On appeal, Foster argues that the failure to allow him to present this exhibit during his case-in-chief tended to diminish its importance and greatly prejudiced him. We disagree. When Foster brought the omission of his exhibit to the court's attention, the court explained the mistake to the jury and gave Foster's counsel ample opportunity to discuss the omitted exhibit in his closing argument. Only after the jury found him guilty did Foster complain that this issue should have been handled differently. Absent a contemporaneous objection, our review is for plain error. See *United States v. Broadnax*, 536 F.3d 695, 699 (7th Cir. 2008); *United States v. Thompson*, 27 F.3d 671, 673 (D.C. Cir. 1994). On plain error review, we may reverse only if the jury probably would have acquitted Foster if it had seen the omitted exhibit during Foster's case-in-chief rather than during closing arguments. See *United States v. Collins*, 604 F.3d 481, 487 (7th Cir. 2010). Foster suffered no such prejudice from the inadvertent omission of a single exhibit from his case-in-chief, an exhibit he presented to the jury and used to argue that the foreclosure showed his innocence.

Foster argues that reversal is still required because the district court had already told the jury that any statements made during closing arguments may not be considered as evidence of innocence or guilt. But the district court also informed the jury that, notwithstanding its prior instruction to the contrary, Foster would be allowed to present his omitted exhibit during his closing

argument. Absent extraordinary circumstances not present in this case, we presume that the jury heeded this instruction and gave Foster's exhibit the consideration it deserved. *E.g.*, *United States v. Ochoa-Zarate*, 540 F.3d 613, 620 (7th Cir. 2008). Foster suffered no prejudice here, let alone such substantial prejudice as would call for reversal on plain error review.

IV. *Sufficiency of the Evidence — Acme's Insured Status*

In a prosecution under the federal bank robbery statute, the government must prove beyond a reasonable doubt that the victim financial institution falls within the coverage of the law. If the victim is a state-chartered credit union, the government must prove that its accounts were insured by the National Credit Union Administration at the time of the robbery. See 18 U.S.C. § 2113(a) & (g); *United States v. Taylor*, 728 F.2d 930, 933 (7th Cir. 1984). To meet that burden, the government presented the testimony of Acme's vice president/comptroller, who identified two government exhibits as insurance certificates showing that Acme was insured by the NCUA. According to the vice president, Acme had been insured by the NCUA since November 13, 1972, and was insured in the amount of $100,000 per member account on the day it was robbed. On cross-examination, and again on redirect examination, the vice president reaffirmed that Acme was insured by the NCUA on the date of the robbery. This insurance was in addition to Acme's insurance against robbery and protected Acme's customers'

accounts against any losses they might incur if Acme went out of business.

This evidence was sufficient to meet the government's burden. See *Taylor*, 728 F.2d at 933 (finding sufficient bank vice president's testimony that "clearly indicated to the jury that the bank was federally insured on" the date of the offense). Even if we assume for the sake of argument that the 30-year-old insurance certificates on their own were not sufficient to show that Acme was insured when it was robbed in 2006, see *United States v. Platenburg*, 657 F.2d 797, 800 (5th Cir. 1981) (vacating conviction where the only evidence of bank's insurance status was a certificate that "antedate[d] the charged events by seven years"), the vice president explained that those certificates remained effective at the time of the robbery. More extensive testimony on this issue was unnecessary, particularly since the vice president's testimony "was uncontroverted by any evidence offered by the defendant." *Taylor*, 728 F.2d at 933 (rejecting defendant's challenge to the sufficiency of the evidence against him); see *United States v. Knop*, 701 F.2d 670, 672-73 (7th Cir. 1983) (deeming evidence of bank's insured status sufficient where defendant never contested the sufficiency of that evidence at trial).

V. *Restoration of Foster's Right to Bear Arms?*

At trial, Foster stipulated that he had previously been convicted of a felony. After his conviction and on appeal, however, he argued that he could not have violated the felon-in-possession statute because his civil

rights were restored following his most recent release from state prison. Under 18 U.S.C. § 922(g)(1), it is unlawful for a person who has been convicted of "a crime punishable by imprisonment for a term exceeding one year" to possess "any firearm or ammunition." A conviction for which a person has had his civil rights restored, however, does not count as a "crime punishable by imprisonment for a term exceeding one year" unless the "restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." 18 U.S.C. § 921(a)(20).

After his conviction, Foster moved to dismiss the indictment and to vacate the guilty verdict, claiming that he "recalls a letter being sent to his mother's house following his release from custody in March 2004," which he understood to have restored all of his civil liberties in Illinois. In purported reliance on this letter, Foster claims, he voted in elections in 2006 and 2008 and appeared for jury duty in 2005. In support of these allegations, Foster attached his affidavit and copies of his 2004 Illinois voter registration, a voting history report, and a certificate of jury service. The district court denied Foster's motion, finding that "there has really been no actual evidence that [Foster's] rights were restored" and concluding that, even if Foster had presented such evidence, he waived this argument when he stipulated that he had been convicted of a felony.

We agree with the district court as to both waiver and the merits. The waiver was clear through the stipulation here. On the merits, Foster's argument turns on

whether, to obtain a conviction under section 922(g)(1), the government must prove beyond a reasonable doubt that Foster's rights had not been restored in the manner described in section 921(a)(20). Although we have not explicitly addressed this precise issue, we have decided a closely related question, holding that a defendant relying on the civil rights restoration provision in section 921(a)(20) to challenge his classification as an armed career criminal at sentencing must show, by a preponderance of the evidence, that his civil rights have been restored. See *Gant v. United States*, 627 F.3d 677, 682 (7th Cir. 2010). Other circuits have held that a conviction under section 922(g)(1) does not require the government to prove beyond a reasonable doubt that the defendant's civil rights have not been restored. *United States v. Bartelho*, 71 F.3d 436, 440 (1st Cir. 1995); *United States v. Jackson*, 57 F.3d 1012, 1016-17 (11th Cir. 1995); *United States v. Flower*, 29 F.3d 530, 535 (10th Cir. 1994). Requiring such proof by the government "would impose an onerous burden," seeing that a defendant "ordinarily will be much better able to raise the issue of whether his . . . civil rights have been restored." *Flower*, 29 F.3d at 535; see *Bartelho*, 71 F.3d at 440 (refusing to require the government to "refute every possibility that criminal defendants have had their prior convictions nullified or their civil rights restored").

Consistent with our decision in *Gant*, we agree with the reasoning of those decisions and conclude that a defendant's claim that his civil rights have been restored is essentially an affirmative defense to a criminal charge under 18 U.S.C. § 922(g)(1). See *Bartelho*, 71 F.3d at 440.

It is a defendant's responsibility to raise this issue and to produce evidence showing that his civil rights have been restored before the matter may be presented to the jury for resolution. *Id.*; *Jackson*, 57 F.3d at 1017; *Flower*, 29 F.3d at 535-36; see *United States v. Vitrano*, 405 F.3d 506, 509 (7th Cir. 2005) (adopting similar interpretation of section 921(a)(20) in context of armed career criminal sentencing enhancements under section 924(e)(1)).

Because the civil rights restoration exception in section 921(a)(20) is not an element of the offense described in section 922(g), Foster's indictment on that charge was sufficient without alleging that Foster's civil rights had never been restored, and the government had no obligation to present any evidence on the topic. If Foster wanted to claim that the State of Illinois had restored his right to carry firearms, he was obligated to present evidence indicating that fact either prior to or during his trial. The district court correctly denied Foster's post-judgment motion to dismiss the indictment and vacate his conviction.

## VI. *Sentencing Issues*

Foster's final argument is that the district court erred when it sentenced him as an armed career offender under 18 U.S.C. § 924(e). We consider this claim de novo, *United States v. Fife*, 624 F.3d 441, 445 (7th Cir. 2010), except to the extent that the alleged error "implicates a factual finding," which we review for clear error. *United States v. Aljabari*, 626 F.3d 940, 950 (7th Cir. 2010), citing *United States v. Gibbs*, 578 F.3d 694, 695 (7th Cir. 2009).

Such findings of fact are entitled to deference unless we have a definite and firm conviction that a mistake has been made. *United States v. Knox*, 624 F.3d 865, 870 (7th Cir. 2010).

Under the Armed Career Criminal Act, any person convicted of being a felon in possession of a firearm who has "three previous convictions . . . for a violent felony" is subject to a mandatory minimum prison term of 15 years. 18 U.S.C. § 924(e)(1). Over Foster's objection, the district court deemed him an armed career criminal because he had three prior violent felony convictions — for robbery in 1980, burglary in 1983, and armed robbery in 1987 — and sentenced him to 284 months in prison.

On appeal, Foster asserts that his 1980 robbery conviction cannot be considered a violent felony under section 924(e) because that conviction was invalid as a matter of Illinois law. According to Foster, although he was a minor at the time of that offense, the Illinois state courts tried him as an adult. This is problematic, he claims, because Illinois law allegedly allows minors to be tried as adults only with an attorney's consent, yet no record of any such consent appears in the record. Absent such consent, Foster says, his 1980 robbery conviction was "voidable" and "should not be counted" as a predicate felony under section 924(e).

This argument is a non-starter. Unless the prior conviction used to enhance a defendant's sentence under section 924(e) was obtained in violation of the defendant's right to counsel, the validity of that conviction may not be challenged at sentencing. *Custis v. United States*, 511

U.S. 485, 487 (1994); *United States v. Jiles*, 102 F.3d 278, 280 (7th Cir. 1996). Although Foster argues that "the failure to obtain the assistance of counsel with regard to the waiver was the equivalent of having no legal representation," such ineffective assistance of counsel is simply not a permissible basis for a collateral attack. *Custis*, 511 U.S. at 496 (refusing to allow collateral attack based on ineffective assistance of counsel because such a claim does not "rise[ ] to the level of a jurisdictional defect resulting from the failure to appoint counsel at all").

Foster also argues that his 1980 robbery conviction cannot be counted under section 924(e) because that conviction falls outside the time limits set forth in certain provisions of the Sentencing Guidelines. We rejected this same argument in *United States v. Wright*, 48 F.3d 254, 255-56 (7th Cir. 1995). Although Foster invites us to overturn *Wright*, he provides no explanation as to why we should do so. "As we have said numerous times, undeveloped arguments are deemed waived on appeal." *Collins*, 604 F.3d at 487 n.2. This principle holds particularly true when a litigant asks us to overturn circuit precedent. See *Santos v. United States*, 461 F.3d 886, 894 (7th Cir. 2006). We see no reason — let alone a compelling reason, *id.* at 891 — to revisit *Wright*.

Finally, Foster argues that none of his prior convictions could be considered under section 924(e), again because Illinois allegedly restored his right to bear arms following his most recent term of incarceration. As under section 922(g)(1), a conviction for which a person has had his civil rights restored does not count as a

violent felony under section 924(e) unless the "restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." 18 U.S.C. § 921(a)(20). In other words, if a state sends a document to a convicted felon that seems to restore all civil rights, "the conviction does not count for federal purposes unless the document warns the person about a lingering firearms disability." *Buchmeier v. United States*, 581 F.3d 561, 566 (7th Cir. 2009) (en banc). To prevail on this argument, Foster "must show, by a preponderance of the evidence, that his rights were restored." *Gant*, 627 F.3d at 682, citing *Vitrano*, 405 F.3d at 509. The district court did not specifically address this matter at sentencing, likely because it had already concluded in denying Foster's post-verdict motion to dismiss the indictment that he had presented no actual evidence that his rights were restored.

We agree that Foster has failed to muster sufficient evidence to prove that Illinois restored his civil rights. For one thing, Foster's evidence indicating that he voted and served on a jury after his release from incarceration says nothing about whether he ever actually received a letter from the state restoring his civil rights — Illinois automatically restores a person's right to vote when his sentence expires. See *Buchmeier*, 581 F.3d at 564; 730 ILCS 5/5-5-5(c) ("A person sentenced to imprisonment shall lose his right to vote until released from imprisonment."). And Illinois does not suspend a felon's right to serve on a jury in the first place. See *Buchmeier*, 581 F.3d at 564-65. Once that evidence is set aside, all that remains is Foster's vague recollection that he received a letter re-

storing his civil rights. The letter itself, however, was conspicuously absent from Foster's submissions to the district court. Lacking any additional evidence that Illinois ever restored Foster's right to carry a firearm, the district court correctly concluded that Foster was an armed career criminal under section 924(e).

The judgment of the district court is AFFIRMED.