In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1557

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARIO ZUNIGA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-cr-00156 — **Charles R. Norgle**, *Judge.*

ARGUED JANUARY 6, 2014 — DECIDED SEPTEMBER 11, 2014

Before EASTERBROOK, WILLIAMS, and TINDER, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Mario Zuniga was arrested for pointing a gun at his ex-girlfriend outside a bar and was charged with being a felon in possession of a firearm and possessing cocaine. Before trial began, the government filed, and Zuniga opposed, a motion in limine to admit a witness's statement that Zuniga was holding a gun. The district court granted the government's motion and at trial Zuniga was

convicted on both counts. Zuniga was given an enhanced sentence because he had three prior convictions that qualified him as an armed career criminal.

On appeal, Zuniga argues that the district court abused its discretion when it admitted a witness's statement that he was holding a gun. We disagree because the statement was properly admitted under the excited utterance exception to the hearsay rule, but even if it was not, the error would be harmless. Zuniga also asserts that remand is warranted because the district court, as opposed to a jury, found that he had three qualifying felony predicate convictions that made him eligible for an enhanced mandatory minimum sentence. We disagree. Under Supreme Court precedent, prior convictions are sentencing factors that may be determined by a judge. Finally, he argues that he should not have been given an enhanced sentence because his civil rights were restored, thereby precluding two of his convictions from being considered predicate offenses under the Armed Career Criminal Act. Because Zuniga did not establish by a preponderance of the evidence that the Illinois Department of Corrections ("IDOC") sent him a restoration-of-rights letter, we reject his argument. We affirm the district court's judgment.

## I. BACKGROUND

On November 2, 2009, Mario Zuniga was at a bar playing pool with friends when Beatrice Suarez, an ex-girlfriend, entered the bar and slapped him across his face. Zuniga immediately took Suarez out the back door of the bar to an area enclosed by a fence. Kente Johnson-Taylor, curious to see what was going on, walked to the rear of the bar, opened the back door, looked into the back fenced-in area, and saw Zuniga holding a gun to Suarez's face. Less than a minute

later, Johnson-Taylor closed the door, walked back to his friend, Nicole Mitchell, and whispered to her that Zuniga had a gun and told her to call the police. Then Johnson-Taylor went to the front door, went outside, walked to the back of the building, stood on the outside of the enclosed area, and waited for the police. As the police arrived, Zuniga and Suarez tried to climb the fence behind the bar to get away, but officers prevented their escape. In the process of securing Zuniga, the officers found a loaded Bryco .38 caliber handgun about seven or eight feet from where he was standing. After Zuniga was placed in the police car, another officer saw Zuniga squirming in the back seat. Officers took him out of the car and spotted two plastic baggies containing cocaine on the back seat. Zuniga was searched and the officers found three additional baggies containing cocaine. In total, the officers found five plastic bags that contained 3.1 grams of cocaine.

Zuniga was originally charged in state court for weapons offenses, but the case was dismissed and he was charged in federal court for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1), and for possessing of cocaine, in violation of 21 U.S.C. § 844(a). Before trial, the government filed a motion in limine to admit Johnson-Taylor's statement to Mitchell that Zuniga had a gun, arguing that the statement was both a present sense impression and an excited utterance under Federal Rules of Evidence 803(1) and 803(2). But Zuniga argued that Johnson-Taylor's statement was not made under the stress of a startling event and was "the product of his reflection, his careful consideration, and his deliberation." The district court granted the government's motion. During trial, Johnson-Taylor and Mitchell both testified that Johnson-Taylor stated

that Zuniga possessed a gun. Zuniga was convicted on both counts.

Before his 2009 arrest, Zuniga was convicted of nine felonies, including three convictions that qualified him as an armed career criminal: a 1985 conviction for robbery; a 1988 conviction for manufacture or delivery of, or possession with intent to manufacture or deliver, cocaine; and a 1996 conviction for attempted murder. At sentencing, the court conducted an evidentiary hearing to explore two issues that could affect the length of Zuniga's sentence: (1) whether his 1988 drug conviction qualified as a predicate offense under the Armed Career Criminal Act ("ACCA"); and (2) whether Zuniga's civil rights were restored when he was released from the Illinois Department of Corrections ("IDOC") on February 14, 1992. The judge found that Zuniga's 1988 drug conviction qualified as a predicate offense under the ACCA and that Zuniga had not demonstrated that his civil rights were restored for his 1985 robbery and 1988 drug convictions. Because of Zuniga's prior convictions, the court applied an enhanced penalty under the ACCA and sentenced him to 188 months' imprisonment. Zuniga now appeals his conviction and sentence.

## II. ANALYSIS

### A. Johnson-Taylor's Statement Properly Admitted

Zuniga argues that the district court abused its discretion by admitting under the present sense impression and excited utterance exceptions to the hearsay rule Johnson-Taylor's statement that Zuniga possessed a gun. The district court's evidentiary rulings are reviewed for abuse of discretion, *United States v. Simon*, 727 F.3d 682, 696 (7th Cir. 2013), and it

will not be reversed "unless the record contains no evidence on which [the trial judge] rationally could have based [his] decision," *United States v. Conley*, 291 F.3d 464, 472 (7th Cir. 2002).

Because Johnson-Taylor's statement was properly admitted under the excited utterance exception, we do not decide whether it was also properly admitted under the present sense impression exception.[1] Under Rule 803(2), hearsay is admissible as an excited utterance if the statement made was related to a startling event and made while the declarant was under the stress of the excitement that caused the statement to be uttered. Fed. R. Evid. 803(2). For an out of court statement to qualify under the excited utterance exception: (1) a startling event must have occurred; (2) the declarant must make the statement under the stress of the excitement caused by the startling event; and (3) the declarant's statement relates to the startling event. *United States v. Joy*, 192 F.3d 761, 766 (7th Cir. 1999).

First, Zuniga argues that Johnson-Taylor was neither startled nor excited when Johnson-Taylor witnessed Zuniga hold a gun to Suarez's head. Zuniga points to Johnson-Taylor whispering to his girlfriend, as opposed to blurting out that Zuniga had a gun, as evidence that Johnson-Taylor was not excited. Zuniga's reasoning is curious because in almost every imaginable scenario, seeing a person pointing a gun at the head of another is a startling situation. Further-

[1] We have previously noted that Rules 803(1) and (2) do not necessarily rest on a sound foundation, but we also have recognized that the exceptions are well established. *See United States v. Boyce*, 742 F.3d 792, 796 (7th Cir. 2014) (applying the present sense impression and excited utterance exceptions to the hearsay rule after noting their limitations).

more, a declarant whispering, as opposed to yelling, does not necessarily mean that the statement cannot qualify as an excited utterance. Zuniga cites no law that stands for the proposition that a statement cannot qualify as an excited utterance because it was whispered, as opposed to yelled. Moreover, it is not beyond belief that Johnson-Taylor would whisper, "he's got a gun," if he was trying to avoid being detected by Zuniga and having the gun pointed at him or prevent people from panicking, which the record indicates Johnson-Taylor was doing here. At trial, Johnson-Taylor stated that Zuniga's demeanor was hostile and his body language was threatening. He also testified that Suarez was scared and that he was concerned that something was about to happen to her. When asked on direct examination why he did not confront Zuniga directly, he stated that the situation was "heated" and he did not want "it to come [his] way." He also said that he did not want to create a panic, which is bound to happen when people hear that someone is pointing a gun at another person. Based on the evidence, we have no trouble finding that Johnson-Taylor witnessed a startling event and the volume at which Johnson-Taylor uttered, "he's got a gun," makes little difference in this case.

Second, Zuniga argues that even if Johnson-Taylor was startled, he did not make his statement while under the stress or excitement of an event. He asserts that because Johnson-Taylor thought about how he was going to avoid a dangerous situation, Johnson-Taylor could not have been under the stress of seeing Zuniga holding a gun. But as we have explained, "a court need not find that the declarant was completely incapable of deliberative thought at the time he uttered the declaration" in order for it to be admissible under the excited utterance exception to the hearsay rule. *Joy*,

192 F.3d at 766. "All that the exception requires is that the statement be made contemporaneously with the excitement resulting from the event." *Martinez v. McCaughtry*, 951 F.2d 130, 135 (7th Cir. 1991). Here, it is clear that Johnson-Taylor uttered his statements sufficiently contemporaneously with Zuniga pointing a gun at Suarez's head. Johnson-Taylor testified at trial that the time between when he saw Zuniga holding a gun and when he told Mitchell what he saw was maybe five seconds. Mitchell testified that it was less than a minute. Both of these sworn accounts suggest that Johnson-Taylor's statement was made under stress, as less than a minute had passed from the time he saw Zuniga pointing a gun at Suarez to the moment he relayed that information to Mitchell. *Cf. Joy*, 192 F.3d at 766 (admitting under the excited utterance exception declarant's statement that was made a few minutes after witnessing an exciting event); *United States v. Shoup*, 476 F.3d 38, 42 (1st Cir. 2007) (finding that declarant's statements to 911 constituted an excited utterance where he made them about one to two minutes after leaving a dangerous situation and going into apartment); *see also Boyce*, 742 F.3d at 795–96 (admitting under the excited utterance exception declarant's statement to 911 made just after she was battered and ran to a neighbor's home to call 911).

Even if Johnson-Taylor's statement was inadmissible evidence because it did not fit under the excited utterance exception, the error was harmless because admission of hearsay testimony does not constitute reversible error "if we determine that the error had no substantial influence on the verdict." *United States v. Dominguez*, 992 F.2d 678, 681 (7th Cir. 1993) (quoting *United States v. Cherry*, 938 F.2d 748, 757 (7th Cir. 1991)). "[W]here other untainted incriminating evidence is overwhelming, the error is deemed harmless." *Id*.

Zuniga argues that the government has waived any harmless error argument, and, therefore, this avenue is unavailable. "[W]e and other courts have sometimes affirmed a criminal judgment on the basis of the harmless-error rule even though the government had not invoked it." *United States v. Ford*, 683 F.3d 761, 768 (7th Cir. 2012). With the removal of Johnson-Taylor's statement, sufficient evidence remains for a rational jury to conclude beyond a reasonable doubt that Zuniga possessed a gun. *See Neder v. United States*, 527 U.S. 1, 18 (1997). Johnson-Taylor testified that he saw Zuniga holding a gun to Suarez's head. He also testified that the gun recovered by police looked "exactly like" the one he saw in Zuniga's possession at the rear of the bar. Even if Johnson-Taylor or Mitchell never testified about what Johnson-Taylor said to Mitchell, the jury still would have heard Johnson-Taylor testify about what he saw at the back of the bar. The impact of the purportedly erroneously admitted evidence was not so overpowering as to taint the jury's view of the other evidence. *See Collins v. Kibort*, 143 F.3d 331, 339 (7th Cir. 1998). Because other evidence remains that supports the charge that Zuniga unlawfully possessed a weapon, we conclude that if an error arose, it did not impact the jury's determination so as to prejudice Zuniga.

## B. Prior Convictions Are Sentencing Factors Determined by Judge

As for his sentence, Zuniga argues that remand is warranted because the district court violated *Alleyne v. United States*, 133 S. Ct. 2151 (2013), when it, as opposed to a jury, found that he had three qualifying felony predicates to make him eligible for the enhanced mandatory minimum penalty. According to *Alleyne*, any fact that increases the mandatory

minimum sentence for a crime is an "element" of the crime, not a "sentencing factor," and must be submitted to the jury. *Id*. at 2155. We review de novo the question of whether a sentencing court erred in sentencing a defendant under the ACCA. *United States v. Foster*, 652 F.3d 776, 792 (7th Cir. 2011).

Zuniga's argument is foreclosed by *Almendarez-Torres v. United States*, 523 U.S. 224, 246 (1998), which held that prior convictions are "sentencing factors" that could be determined by a judge, and did not need to be alleged in the indictment or proven to a jury. The Court explicitly declined to decide whether the exception created in *Almendarez-Torres* was still valid. *See Alleyne*, 133 S. Ct. at 2160 n.1. Because the parties in *Alleyne* did not contest the vitality of *Almendarez-Torres*, and because the Court did not rule on the matter, *Almendarez-Torres* is still good law. *See Boyce*, 742 F.3d at 799. Therefore, under the narrow exception created by the Court in *Almendarez-Torres*, prior convictions are not facts that must be submitted to a jury, but rather may be found by judges. *United States v. Johnson*, 743 F.3d 1110, 1111 (7th Cir. 2014).

### C. Civil Rights Not Restored

Zuniga also argues that the district court erred because it found at sentencing that his civil rights had not been restored, and according to his interpretation of *Alleyne*, the prosecutor was required to prove this to a jury. Under § 922(g)(1), a person who has been convicted of "a crime punishable by imprisonment for a term exceeding one year" may not possess "any firearm or ammunition." Normally, the maximum prison term for a felon convicted of possessing a firearm is ten years. *See* 18 U.S.C. § 924(a)(2). How-

ever, the ACCA mandates a minimum sentence of fifteen years for a defendant with three prior serious drug convictions or violent felonies, who is subsequently convicted for unlawful possession of a firearm. *See* § 924(e)(1); *Logan v. United States*, 552 U.S. 23, 128 S. Ct. 475, 479 (2007). If the defendant has had his civil rights restored with regard to a prior felony, the prior felony does not count as a predicate offense for a § 922(g)(1) violation unless the "restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." 18 U.S.C. § 921(a)(20); *see also Foster*, 652 F.3d at 791. The district found that Zuniga had three qualifying predicates under the ACCA and gave him an enhanced sentence. We review de novo the district court's application of the ACCA to Zuniga's sentence and its factual findings for clear error. *Kirkland v. United States*, 687 F.3d 878, 882-83 (7th Cir. 2012).

In *Apprendi v. New Jersey*, the Supreme Court concluded that, other than the fact of a prior conviction, any facts that increase the penalty beyond the statutory maximum to which a criminal defendant is exposed must be submitted to the jury, and proved beyond a reasonable doubt. 530 U.S. 466, 490 (2000). In *United States v. Brown*, the defendant pled guilty to bank robbery and was sentenced to life in prison under the federal "three strikes" law. We were asked to determine whether legislation that placed the burden on the defendant to prove the affirmative defense that his offense did not qualify as a serious violent felony violated *Apprendi* and by implication whether the sentencing judge could make this determination. 276 F.3d 930 (7th Cir. 2002). The defendant argued, invoking *Apprendi*, that whether he committed a serious felony with a dangerous weapon was a fact that the prosecution was required to prove to a jury beyond

reasonable doubt. In reviewing his case, we stated that while the prosecution must prove all elements of the charged offense beyond a reasonable doubt, legislation that creates affirmative defenses can place the burden of proving that affirmative defense on the defendant without violating *Apprendi*. *Id*. at 933.

As mentioned earlier, under *Alleyne*, facts that increase the mandatory minimum sentence must be found by the jury, 133 S. Ct. at 2155, but the Court first used the principle with regard to statutory maximum sentences in *Apprendi*. 530 U.S. at 490. Since the principle applied in *Apprendi* applies with equal force to facts increasing the mandatory minimum, *Alleyne*, 133 S. Ct. at 2160, there is no reason we cannot apply the logic used in *Brown* to this case. In *Alleyne*, the Court said, "[t]he touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an 'element' or 'ingredient' of the charged offense." *Id*. at 2158. We have stated previously that, "the civil rights restoration exception in section 921(a)(20) is not an element of the offense described in section 922(g)," but rather "is an affirmative defense to a criminal charge under 18 U.S.C. § 922(g)(1)." *Foster*, 652 F.3d at 791-92; *see also United States v. Osborne*, 173 F.3d 853 (4th Cir. 1999) (stating that the court has explicitly found that lack of restoration of civil rights is not an element of the offense stated in § 922(g)); *United States v. Bartelho*, 71 F.3d 436, 439 (1st Cir. 1995) (stating that the fact that the right to carry a firearm has not been restored is not an element of a § 922(g) violation). Applying the logic used in *Brown*, we conclude that the district court properly decided whether Zuniga's civil rights were restored because the underlying facts that could support that determination consti-

tute an affirmative defense, not an element of the offense, and are not covered by *Alleyne*.

But Zuniga argues that, in the event that *Alleyne* is inapplicable, he met his legal burden of establishing that his civil rights were restored in 1992 and that his 1985 robbery conviction and his 1988 drug conviction are not ACCA predicate offenses. We disagree. Zuniga first challenges the burden of proof that he must meet when he alleges that his civil rights were restored. Pre-*Alleyne*, when a defendant claimed that his civil rights were restored, it was the defendant that bore the burden of showing by a preponderance of the evidence that his civil rights were restored. *Foster*, 652 F.3d at 793. Zuniga argues that placing the burden on him does not survive *Alleyne*, but as we previously stated, since *Alleyne* does not apply here, he bears the burden of showing that his civil rights were restored. Since it is Zuniga who bears this burden, the only way that he wins on his claim is if he can show that the district court clearly erred by finding, by a preponderance of the evidence, that he did not meet his burden. *See United States v. Burnett*, 641 F.3d 894, 896 (7th Cir. 2011).

Zuniga faces an uphill battle because he does not possess an IDOC letter that states that his rights were restored, but he hopes that we will infer from a number of facts that they were. At the heart of Zuniga's argument are the following five propositions that he argues supports the conclusion that his civil rights were restored:

1. The Illinois Department of Corrections policy of notifying releasees about their restored rights was enacted on July 1, 1991 – more than 7 months before Zuniga was released from IDOC custody (February 14, 1992);

2. the IDOC policy was effective immediately;

3. the IDOC policy notifications became automatic by March 25, 1992;

4. prior to automatic computer notification, notification was made to releasees either through the central Springfield office or directly through the facility an inmate was released from; and

5. the content of the notifications to releasees did not change upon the notifications becoming automatic; the only change was in the manner in which notifications were sent (through the use of computer generated notices).

We do not believe that Zuniga has met his burden. While IDOC may have enacted a policy before he was released from prison that informed releasees by letter that their rights were restored, there is no credible evidence that the IDOC implemented the policy or actually sent such letters before March 1992 (one month after Zuniga was paroled). In support of his claim, Zuniga presented a letter to the district court from IDOC legal counsel who canvassed people that were IDOC employees in 1991-92. IDOC legal counsel asked the employees whether they recalled if defendants were notified of the restoration of their civil rights. Some employees remembered letters going out. The problem Zuniga faces is that nobody knew exactly when these letters went out, what exactly inmates were told, or where the letters came from. In a follow up email from the government, legal counsel also admitted that some of the canvassed employees may have been thinking of the wrong period when they discussed whether notification letters were sent, that IDOC did not know and could not know for certain if notification letters were created during the period Zuniga was released from

prison, nor had any information as to what releasees were told about their restored rights. These vague and sometimes contradictory recollections of IDOC employees about events that occurred over twenty years ago is not sufficient to show that the district court clearly erred.

Alternatively, Zuniga argues that he met his burden at sentencing based on the presumption of regularity and the fact that IDOC's policy of notifying releasees about their restored rights went into effect on July 1, 1991, but this argument fails as well. Under the presumption of regularity doctrine, we will presume that public officers will properly carry out their official duties, so long as there is no evidence to the contrary. *United States v. Lee*, 502 F.3d 691, 697 (7th Cir. 2007). Underlying this presumption is that the government engages in the challenged activity regularly and adheres to established procedures. *See Wilson v. Hodel*, 758 F.2d 1369, 1372 (10th Cir. 1985).

Based on the record, we find Zuniga cannot rely on the presumption because evidence exists that IDOC may not have sent restoration-of-rights letters to releasees when Zuniga was discharged from prison. Although IDOC enacted its policy of notifying releasees about their rights in July 1, 1991, IDOC stated that, based on employee interviews, it was unclear if IDOC sent letters to releasees at the time Zuniga was released. When pressed if the IDOC in fact followed its policy enacted July 1 by providing notification to releasees, IDOC said that it did not know and could not ascertain when or if notifications were sent prior to March 1992. IDOC further stated that prior to March 26, 1992 when notifications became automatic, it did not know, nor could it ascertain how notifications were made to releasees. Finally, IDOC had

no information about what releasees were specifically told regarding their rights. Based on the evidence, it is unclear that restoration-of-rights letters were sent, who sent them, and what information the letters contained. Without more, the evidence Zuniga presents does not establish the presumption of regularity, which would permit us to infer that the IDOC sent a restoration-of-rights letter to him. Because Zuniga cannot rely on the presumption of regularity, he has failed to show that the district court clearly erred in finding that his civil rights were not restored.

### III. CONCLUSION

We AFFIRM the district court's judgment.