**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Vernon JOY, Defendant–Appellant.**

**No. 98–4034.**

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1999.

Decided Sept. 28, 1999.

Virginia M. Kendall, Office of the United States Attorney, Chicago, IL; Demetra Lambros (argued), Department of Justice, Criminal Division, Appellate Section, Washington, DC, for Plaintiff–Appellee.

Douglas E. Whitney (argued), Office of the Federal Defender Program, Chicago, IL, for Defendant–Appellant.

Before WOOD, Jr., RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

A jury convicted Vernon Joy of being a felon in possession of a firearm. He challenges three rulings made by the district court in the course of his trial: the court's admission of a recording of a 911 call; the admission of testimony that Joy used the firearm in question in a burglary of a house; and the district court's denial of his motion for a mistrial based on prosecutorial vouching. Joy also contends that the district court erred in its calculation of his criminal history for purposes of sentencing. Finding no error, we affirm.

## I.

Vernon Joy's ("Joy") friend Paul Ortiz entered a plea agreement with the government and testified against Joy at his trial. Ortiz related that on the evening of August 6, 1997, Joy came to Ortiz's house in Elgin, Illinois. Joy appeared very anxious and told Ortiz that because Joy's friend did not show up, Ortiz had to go with him. When Ortiz refused, Joy became angry and stated that he had a gun and was not playing games. He then made a gesture indicating that he had a gun and implying that Ortiz had better comply with his demand. As it turned out, Joy wanted Ortiz's help in burglarizing a home in the neighborhood. While Ortiz was acting as a lookout, Joy emerged from the house carrying a pillowcase full of loot. After the pair walked back to Ortiz's house, Joy demanded that Ortiz drive him to the house that Joy shared with his brother, Paul Joy.

Later, Vernon Joy's girlfriend arrived at the Joy residence. When she proceeded to walk through the house Paul Joy stopped her and started yelling at her. Vernon Joy then got into the altercation and it soon escalated to a point where he retrieved a handgun from his room and started threatening his brother. Paul Joy ran upstairs and called the 911 dispatcher, who repeatedly called Paul Joy back after he hung up. At the trial, the jury listened to a recording of the conversations and transcripts were given to the individual jurors.[1]

---

1. Paul Joy did not testify at the trial. Instead, his testimony before the grand jury was read

Paul Joy: hello

Dispatch: this is Elgin 911

Paul Joy: yeah, get me the po—

Dispatch: you keep calling and hanging up

Paul Joy: yeah, get me the police at 454 · Fremont right now

Dispatch: what's wrong?

Paul Joy: right now

Dispatch: hello

Paul Joy: gun, gun play. Right now

Dispatch: what is going on?

Paul Joy: get me the police here now

Dispatch: sir (hangup)

Dispatch calls 289–2258

Paul Joy: yeah

Dispatch: this is the Elgin Police

Paul Joy: yeah, ·get me the police here right away

Dispatch: O.K., we're goin' to 454 Fremont

Paul Joy: yeah

Dispatch: what's wrong over there?

Paul Joy: what's wrong?

Dispatch: what's wrong?

Paul Joy: you'll see when you get here

Dispatch: no, I need to know what's wrong sir

Paul Joy: Well we got people pullin' guns and everything else

(shouting in background)

Dispatch: you got people, well I need to know that

Paul Joy: they're pullin' guns and burglaries everything

Dispatch: who's pullin' guns?

Paul Joy: Vernon Joy

Dispatch: Vernon Joy

Paul Joy: get here right away (hangup)

Dispatch calls 289–2258

Paul Joy: hello

Dispatch: hi, it's the Elgin Police

Paul Joy: yeah

Dispatch: we're on the way. Who's got the gun?

Paul Joy: Vernon Joy

Dispatch: Vernon's got the gun? What kind of gun does he got?

Paul Joy: a .25 automatic

Dispatch: .25 automatic

Paul Joy: and he just pulled some burglaries tonight

Dispatch: where's he at now?

Paul Joy: he out here in the yard

Dispatch: he in the yard. Is he white or black?

Paul Joy: he puttin' it in a black Riviera, he's pullin off. He's with a white guy.

[911 Trans.]

Realizing that Paul Joy was calling the police, Ortiz ran to his car. Vernon Joy followed him with the gun and the loot while yelling "Get me out of here. Paul's calling the cops." Ortiz had driven the car out of the driveway and up the street when the Elgin police intercepted him. Elgin police officer John Slocum testified that after he stopped Ortiz's car he observed Vernon Joy exiting the vehicle. Slocum instructed Joy to put his hands in the air, and noticed that he was holding a small handgun. Joy disregarded Slocum's instructions and fled on foot with the gun. Slocum chased him through several yards and a vacant lot where he saw Joy throw the gun. He continued to pursue Joy and eventually subdued him after a brief struggle. Slocum and other officers then proceeded to look for the gun in the area where Joy had thrown it. With the help of a canine, the officers retrieved a loaded Jennings .25 caliber, semi-automatic pistol from the lot. Slocum identified it as look-

into evidence. He testified to the grand jury that he never saw his brother with a gun that evening, but merely assumed that his brother was going to get a gun. He did admit, however, that he saw a handgun on the dining room table, which he thought belonged to Ortiz. Furthermore, Paul Joy recounted that Vernon Joy had previously pulled a rifle on him while the two were on a fishing trip.

ing similar to the gun that he had seen Joy carrying, and it was of the same caliber as the gun Paul Joy told the dispatcher that his brother was holding. The jury eventually convicted Vernon Joy of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Because Joy had an extensive criminal history, he was sentenced to 210 months of imprisonment and 3 years of supervised release.

## II.

### A. Excited Utterances

Joy first argues that the district court erred in admitting the tape and transcripts of the 911 call because they contained hearsay.

■■■ We review the district court's evidentiary decisions for an abuse of discretion. *United States v. Bradley*, 145 F.3d 889, 892 (7th Cir.1998). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(c). Under Fed.R.Evid. 802, hearsay is not admissible unless an exception to the rule applies. One such exception exists for so-called "excited utterances." That is, statements "relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition" are not excluded by the hearsay rule. Fed. R.Evid. 803(2). This exception is premised on the belief that a person is unlikely to fabricate lies (which presumably takes some deliberate reflection) while his mind is preoccupied with the stress of an exciting event. *Martinez v. McCaughtry*, 951 F.2d 130, 134 (7th Cir.1991); *Ferrier v. Duckworth*, 902 F.2d 545, 548 (7th Cir. 1990).[2] For a statement to be admissible under this exception the proponent must demonstrate that: (1) a startling event occurred; (2) the declarant makes the statement while under the stress of excite-

ment caused by the startling event; and (3) the declarant's statement relates to the startling event. *United States v. Hall*, 165 F.3d 1095, 1109 (1999); *United States v. Sowa*, 34 F.3d 447, 453 (7th Cir.1994). Accordingly, the declarant must have personally perceived the startling event. *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir.1998). Furthermore, the trial court must be able to determine that the declarant's state of mind at the time that the statement was made precluded conscious reflection on the subject of the statement. *Hall*, 165 F.3d at 1109; *United States v. Zizzo*, 120 F.3d 1338, 1355 (7th Cir.1997). Of course, a court need not find that the declarant was completely incapable of deliberative thought at the time he uttered the declaration. *Martinez*, 951 F.2d at 135.

■■ Joy concedes that the first and third criteria are satisfied, but he contends that his brother was not under the stress of the excitement when he made the statements at issue, as several minutes had passed. "An excited utterance need not be contemporaneous with the startling event to be admissible under rule 803(2)." *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir.1998). Rather, the utterance must be contemporaneous with the excitement engendered by the startling event. *Webb v. Lane*, 922 F.2d 390, 394 (7th Cir.1991); *Martinez*, 951 F.2d at 135. Here, Paul Joy could still have been under the stress of the excitement, as only a few minutes had passed from the time he had been in a heated argument with his brother and had seen him wave a gun around. Moreover, even during the call the excitement continued, as there was yelling in the background. Additionally, Paul Joy's responses to the dispatcher's questions were short and quick, further indicating that he was not capable of deep reflection at that time. Thus, there was an adequate basis for the district court to believe that Paul Joy's statements were sufficiently spontaneous, excited, and impulsive, and that they were

---

**2.** We have previously questioned the rationale for this rule. *See Ferrier,* 902 F.2d at 548

(excited utterances "may not be as reliable a form of hearsay as some have thought").

not the product of reflection or deliberation.

■ Joy also argues that because the statements were in response to the dispatcher's questions, they could not have been excited utterances. The fact that Paul Joy was answering questions, rather than giving a spontaneous narrative, does not indicate that he was not excited when he provided the answers. *See Webb*, 922 F.2d at 394 (the fact that declarations were responses to questions did not destroy their "spontaneity"). On the contrary, it is possible for someone to be too excited to volunteer pertinent information (as Paul Joy appeared to be), and thus the inherent "guarantee of truthfulness" supporting the admission of excited utterances applies equally to declarations made in response to an inquiry. Importantly, there is no "absolute spontaneity" requirement to the excited utterance exception to the hearsay rule. *See United States v. Glenn*, 473 F.2d 191, 193, 194 (D.C.Cir.1972) (the fact that declarations were prompted by questions of "what happened?" and "who did it?" did not destroy their spontaneity). Because all three elements of the excited utterance exception were satisfied, the district court did not abuse its discretion in admitting the 911 recording and transcripts of the recording into evidence.[3]

## B. Personal Knowledge

Joy next argues that the district court erred in admitting portions of the 911 recording, because on these parts Paul Joy mentions that burglaries had been committed. Joy asserts that his brother did not have personal knowledge of these facts.

■ The Federal Rules of Evidence provide that "[a] witness may not testify about a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed.R.Evid. 602. Because most knowledge is inferential, personal knowledge includes opinions and inferences grounded in observations or other first-hand experiences. *Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991); *see Bohannon v. Pegelow*, 652 F.2d 729, 731, 732 (7th Cir.1981) (permitting a witness who had observed an arrest to testify that she believed that it was motivated by racial prejudice). The inferences reached from a witness's observations need not reach the level of absolute certainty to be admissible. *United States v. Rodriguez*, 968 F.2d 130, 143 (2d Cir.1992). Rather, the key question for the trial court is whether a reasonable trier of fact could believe that a witness had personal knowledge of the facts about which he testified. *Tocco*, 135 F.3d at 128. " 'Evidence is inadmissible . . . only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to.' " *United States v. Sinclair*, 109 F.3d 1527, 1536 (10th Cir.1997).

■ Here, although there was no evidence which showed that Paul Joy ever observed his brother burglarize a house, there was more than enough circumstantial evidence to show that Paul Joy could have inferred his brother committed a burglary, and that this inference was reasonable. First, Paul Joy testified to the grand jury that he thought burglaries had been committed because he saw Ortiz with a gun and with stolen jewelry around his neck. Additionally, there was jewelry strewn on Vernon Joy's bed, and various people came into the house to inspect the jewelry for possible purchase. As Paul Joy's former girlfriend—Katrina Malone— testified, she and the others who were at the house that night knew that the jewelry was stolen. Furthermore, Ortiz had told

---

**3.** Joy argues that, in the event that we find the recording admissible under the residual exception to the hearsay rule, we would need to address whether the admission violated the Confrontation Clause of the Sixth Amend- ment. Because we find that recording admissible under the excited utterances exception, we do not need to analyze the case under the Confrontation Clause. *See Martinez,* 951 F.2d at 134.

Malone and possibly others that he had burglarized a house earlier in the evening. Moreover, as Vernon Joy was fleeing the house, he carried two boxes of loot with him, suggesting that the delay caused by having to carry the boxes was worth the increased risk of getting caught by the approaching police. Finally, Paul Joy knew that his brother had burglarized houses before, and indeed was convicted of burglary and other thefts. With these facts, it would be pretty obvious that the jewelry was obtained by theft, and so Paul Joy could have reasonably inferred that a burglary had been committed. Paul Joy had sufficient personal knowledge to make the statement: "he just pulled some burglaries tonight." Accordingly, the district court did not abuse its discretion in admitting into evidence these portions of the 911 recording.

## C. Evidence of the Burglary

■ Joy next contends that because he was only charged with being a felon in possession of a weapon, the trial court erred in admitting Ortiz's testimony that he and Joy had burglarized a house earlier in the evening. Specifically, Joy argues that this evidence was admitted in violation of Fed.R.Evid. 404(b), as it was admitted only to show that Joy had a bad character.

Rule 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." The government asserts that evidence of the burglary provided helpful background information and was relevant to demonstrating that Joy possessed a firearm, that he did so knowingly, and that he had a motive for possessing it. Along these lines, Ortiz testified that Joy indicated to him that he had a gun and that he would use it if Ortiz did not cooperate in the burglary. Prior cases have allowed

admission of similar 404(b) evidence to show motive or knowledge. In *United States v. Hatfield*, the Sixth Circuit ruled that evidence of a burglary was properly admitted under Rule 404(b), as it supported the government's contention that the defendant knowingly possessed a gun. 815 F.2d 1068, 1072 (6th Cir.1987). Similarly, in *United States v. Gonzalez*, the Second Circuit held that the "burglary evidence in this case was relevant to a possible motive for the defendants' possession of firearms and to provide crucial background evidence that gave coherence to the basic sequence of events...." 110 F.3d 936, 942 (2d Cir.1997). Finally, in *United States v. Collins*, the Ninth Circuit held that evidence of the defendant's involvement with a burglary was relevant to show why the defendant possessed a gun. 90 F.3d 1420, 1429 (9th Cir.1996). "Had the government not introduced the [evidence of the burglary] the jury would have been left wondering why [the defendant] would have wanted a gun." *Id.* The reasoning in these cases is persuasive and is applicable to the circumstances in this case. The evidence of Joy's involvement with a burglary earlier in the evening was relevant to showing that he knowingly possessed a gun and had a motive for the possession. Therefore, the district court did not abuse its discretion in admitting this evidence.

## D. Prosecutorial Vouching

■ Next, Joy contends that the district court erred in denying his motion for a mistrial based on prosecutorial remarks which Joy characterizes as improper vouching for the truthfulness of witnesses. Specifically, Joy objects to the prosecutor's closing argument where she stated that "we found the gun," because the police officers' testimony about finding the gun now had the prestige of the government behind it. He expressed concern that the jury might believe that a member of the prosecution team was on the scene when the gun was recovered, thus giving the

prosecutor "evidence external to the record" of where and how the gun was found.

■■■ We review for an abuse of discretion the denial of a motion for a mistrial on the grounds of improper vouching. *United States v. Alexander*, 163 F.3d 426, 429 (7th Cir.1998) (per curiam). Vouching occurs when a prosecutor expresses his personal belief in the truthfulness of a witness or when he implies that facts not before the jury lend credence to the witness. *United States v. Amerson*, 185 F.3d 676 (7th Cir.1999). The government is prohibited from vouching for the credibility of its witnesses. *United States v. Severson*, 3 F.3d 1005, 1014 (7th Cir.1993). This rule against vouching is designed to guard against the prosecutor intruding on the jury's prerogative to make credibility determinations. *United States v. Young*, 470 U.S. 1, 18, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

■■■ In reviewing allegations of improper vouching we follow a two-step process. First we look at the comments in isolation to see if they are improper. *Alexander*, 163 F.3d at 429. If we find that the comments are proper, we may terminate the analysis at that point. *Id.*; *United States v. Whitaker*, 127 F.3d 595, 606 (7th Cir.1997). If they are improper, we must then examine the comments in light of the record as a whole to determine whether the remarks deprived the defendant of a fair trial. In making this determination we look at five factors: (1) the nature and seriousness of the prosecutor's misconduct; (2) whether the prosecutor's remarks were invited by the defense; (3) whether the trial court's instructions to the jury were adequate; (4) whether the defense was able to counter the improper comments through rebuttal; and (5) the weight of the evidence against the defendant. *Alexander*, 163 F.3d at 429; *Whitaker*, 127 F.3d at 606. The ultimate question is "whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Thus, to prevail on this argument, the defendant must show that the prosecutor's comments affected the outcome of the trial or caused the jury to find him guilty when they otherwise might not have done so. *Whitaker*, 127 F.3d at 606.

Here, the prosecutor stated in her rebuttal argument:

> They want you to believe that somehow he [the officer] couldn't see the gun. Well, that would be fine if it were a different case, if we never found the gun. I mean that would be a very critical thing for you to think about, right?
>
> If we had an officer on the stand who said I saw him with the gun and then we never found it, then that's a very critical piece of information because you have to judge could he possibly have seen that gun. But ladies and gentlemen, we found the gun exactly where he said it was thrown and exactly where it was picked up. You just can't explain that away.
>
> \* \* \*
>
> But does it [the lighting] matter? I mean does that really matter? It doesn't matter because it would only matter if we didn't find the gun. We found the gun. We found not only the gun, we found the .25–caliber gun described by Paul Joy. We found the chrome gun described by Paul Joy and Paul Ortiz. We found the gun within minutes of the officer saying that it was going to be there.

[Trans. 665, 666]

Viewing these comments in isolation, apart from the testimony given during the trial, the use of the first person pronoun "we" could possibly imply that the prosecutor herself or one of her staff retrieved the gun. But when considered in the context of this case, common sense quickly dispels this notion. Nobody could reason-

ably interpret the prosecutor's comments as suggesting that she was out with the police, just after midnight and within an hour after the police were called, scouring the lot for a gun. Rather, a reasonable person would correctly interpret these remarks as consistent with the testimony that the jury previously heard: after searching the lot with the assistance of a canine, the police recovered the gun in the same vicinity where Officer Slocum saw Joy throw it. The fact that the gun was found was the idea conveyed by these remarks. This was clearly not a suggestion that the prosecutor had access to other information, even though one of the prosecutors imprecisely said "we" rather than "the police."

The defendant asserts that the prosecutor used "we" about ten times, and Joy makes much of this fact. True, the two prosecutors used the personal pronoun "we" a number of times throughout their opening and closing arguments.[4] These statements are not entirely innocuous and attorneys should be more precise when they address juries. But in this context these statements do not constitute vouching. The prosecutor's remarks cannot reasonably be interpreted as expressing a belief in the credibility of a witness or implying that facts not in evidence supported the government's testimony.[5] The defense also made much of the fact that the lighting was bad, that the police couldn't really see the gun or see him throw it away. Yet the fact that the police found a gun was largely uncontested. The defense counsel presented no evidence that the gun had been planted, although she vaguely insinuated this in her closing argument. Thus, the evidence overwhelmingly supported the view that the police found a gun, the one which Joy carried and pitched. The

prosecutor's general use of the pronoun "we" did not infect the trial with unfairness, and the district judge did not abuse its discretion in declining to grant a mistrial.

### E. Criminal History Calculation

■■■ Finally, Joy argues that the district court double-counted two of his prior convictions in calculating his criminal history category under U.S.S.G. § 4A1.2. The presentence report listed three prior state convictions: (1) residential burglary in 1989; (2) theft in 1991; and (3) deceptive practices in 1991. This resulted in Joy's placement in criminal history category V. Joy maintains that the theft and deceptive practices convictions were related under § 4A1.2(a)(2), because they were part of a common scheme or plan, and thus they should only count as one conviction. This would result in placing him in criminal history category IV.[6]

■■■ We review de novo the district court's interpretation of the Sentencing Guidelines; its decision as to whether two prior sentences are related is a factual determination which we review for clear error. *United States v. Wiseman*, 172 F.3d 1196, 1219 (10th Cir.1999); *United States v. Emerson*, 128 F.3d 557, 562 (7th Cir.1997) ("We review a sentencing court's factual determinations for clear error and its interpretations of the guidelines *de novo*."). Section 4A1.1 provides detailed instructions for computing a defendant's criminal history category, some of which depend on a defendant's prior sentences. Section 4A1.2 provides definitions and instructions for the criminal history category computation. Section 4A1.2(a)(2) deals with prior sentences and provides that

---

4. Joy didn't object to the prosecutor's use of the pronoun "we" during the prosecution's opening argument.

5. Additionally, we also note that even if the jury understood the prosecutor to mean that she herself found the gun, the court's instruction that the jury was the sole judge of credi-

bility and the facts sufficiently prevented any prejudice to the defendant.

6. With an offense level of 33, criminal history category IV has a range of 188–235 months of imprisonment, compared to 210–262 months for category V.

"[p]rior sentences imposed in unrelated cases are to be counted separately. Prior sentences in related cases are to be treated as one sentence for purposes of § 4A1.1(a), (b), and (c)." Prior sentences are considered related in three instances, one of which is when they "were part of a single common scheme or plan." U.S.S.G. § 4A1.2(a)(2) App. n. 3.

 Because the terms "scheme" and "plan" are words of intention, for purposes of § 4A1.2(a)(2), crimes are part of a single common scheme or plan only if they were jointly planned or when one crime would normally entail the commission of the other. *United States v. Ali*, 951 F.2d 827, 828 (7th Cir.1992).[7] Under this analysis, a defendant must show that he intended to commit both crimes from the outset or he intended to commit one crime which necessarily involved committing the other. *United States v. Carroll*, 110 F.3d 457, 460 (7th Cir.1997). Crimes are not related for purposes of this provision simply because they have a similar modus operandi. *United States v. Sexton*, 2 F.3d 218, 219 (7th Cir.1993). Neither close temporal proximity nor the similar nature of two crimes requires a finding that the offenses were part of a common scheme. *Carroll*, 110 F.3d at 460; *United States v. Woods*, 976 F.2d 1096, 1098, 1099 (7th Cir.1992) (three robberies committed eight days apart were not related because mere repetition of similar conduct is not sufficient to show a common scheme). The test is one of singularity, not similarity. *United States v. Yahne*, 64 F.3d 1091, 1096 (7th Cir.1995). Because the defendant is in the best position to know whether he jointly planned two or more crimes and is the

beneficiary of any reduction in his sentence, he has the burden of showing that his prior offenses were part of a single scheme or plan. *Carroll*, 110 F.3d at 460; *United States v. Cowart*, 90 F.3d 154, 159 (6th Cir.1996).

Here, Joy's theft conviction arose out of his receipt of coins which had been stolen in a residential burglary on October 27, 1991. The next day, he sold the coins to the Silver Reef Coin Shop, which gave Joy a check for $8,661.87. When the dealer realized that the coins were stolen, he stopped payment on the check. After Joy's first attempt to cash the instrument, he found out that it was invalid. Nevertheless, he attempted to cash it again on October 29, which resulted in his deceptive practices conviction. It is obvious that these two crimes did not arise out of a single common scheme or plan. The theft of coins or the receipt of stolen coins does not necessarily entail an attempt to cash a bad check. Furthermore, Joy cannot credibly argue that he planned both the theft of the coins and the cashing of a previously-dishonored check at the same time, as this would mean that Joy knew in advance that the coin dealer was going to stop payment on the check. If Joy truly were so prescient that he knew that the check would be invalidated, he would not have accepted it in the first place.

Joy's case is similar to the *Ali* case. Ali's first crime was the robbery of a supermarket, and part of his haul included a money order. 951 F.2d at 827. He subsequently forged a signature on the money order, which was his second crime. *Id.* In rejecting Ali's claim that his robbery and

---

7. We realize that this is not the same test which we have used to determine whether a common scheme or plan existed for purposes of ascertaining relevant conduct under § 1B1.3(a)(2). Under that provision, "offenses are part of a common scheme or plan if they are connected by at least one common factor, such as 'common victims, common accomplices, common purpose, or similar modus operandi.'" *United States v. Bacallao*, 149 F.3d 717, 719 (7th Cir.1998) (quoting

U.S.S.G. § 1B1.3(a)(2) App. n. 9). Despite the Guidelines' use of similar language, we have interpreted this term to mean different things in the different contexts. Other circuits disagree with this interpretation. *See United States v. LaBarbara*, 129 F.3d 81, 86 (2d Cir.1997); *United States v. Mullens*, 65 F.3d 1560, 1565 (11th Cir.1995). But we find these cases unpersuasive and see no reason to depart from the settled law in this circuit.

forgery convictions were related, we said that nobody "robs without intending to obtain value from what is taken," and thus Ali did not plan in advance to commit forgery. Also, the forgery was not part of a common scheme or plan simply because it arose out of a previous crime. *Id.* Similarly in this case, Joy would not have planned in advance to receive a bad check in exchange for the stolen goods. It was simply fortuitous that the dealer stopped payment on the check, just as Ali's cash register just happened to contain a money order. Furthermore, Joy's two crimes are not part of a common scheme just because one crime proceeded out of the other. Because Joy has not carried his burden of showing a common scheme or plan, the district court did not clearly err in counting these prior convictions separately for purposes of determining Joy's criminal history category.

For the foregoing reasons we affirm the district court.