In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1087

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DARNELL BOYCE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 CR 00533 — **Robert M. Dow, Jr.,** *Judge.*

ARGUED OCTOBER 3, 2013 — DECIDED FEBRUARY 13, 2014

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* After a foot chase during which an officer said he saw Darnell Boyce throw a gun into a yard, officers recovered the gun from the area and also found ammunition for the gun in Boyce's pocket. A jury convicted Boyce of being a felon in possession of a firearm and ammunition. He maintains that he could lawfully possess a handgun

on the premise that his civil rights had been restored. In light of our precedent, we disagree and conclude that a letter to Boyce restoring his civil rights did not do so for all his prior felonies. Boyce also challenges the admission at trial of statements of Sarah Portis, the mother of four of his children, made during a 911 call, including that Boyce had a gun. We find no abuse of discretion in the district court's admission of the statements under the excited utterance exception to the hearsay rule because they were made while under the stress of a domestic battery and related to it. We affirm the district court's judgment.

## I. BACKGROUND

Sarah Portis called 911 at around 7:45 p.m. on March 27, 2010, asking that police come to her residence because her child's father had just hit her and was "going crazy for no reason." The 911 operator asked, "Any weapons involved?" to which Portis responded, "Yes." The operator asked what kind, and Portis said, "A gun." The operator said, "He has a gun?", then "Hello?", and Portis responded, "I, I think so. 'Cause he just, he just." After the operator said, "Come on," Portis responded, "Yes!" twice. The operator again inquired, "Did you see one?" and Portis replied, "Yes!" The operator then cautioned Portis that if she wasn't telling the truth, she could be taken to jail. Portis responded, "I'm positive." After giving a description of what Boyce was wearing, the operator asked where he was at the moment. Portis responded that she "just ran upstairs to [her] neighbor's house" and didn't know whether Boyce had left her house yet.

Within minutes, Officers Robert Cummings and Eugene Solomon responded to the 911 call. After determining Boyce was no longer in the apartment, they interviewed Portis for

about five to ten minutes. Officer Solomon described Portis as "appear[ing] emotional as if she just had an argument, perhaps a fight, someone who was just running." The officers then went to their car to complete a case report for domestic battery. While they were sitting in their squad car, the officers saw that Boyce had returned to the outside of Portis's residence and was calling out her name. Officer Solomon asked Boyce to come over, but Boyce ran away instead, and Officer Cummings ran after him. During the chase, Officer Cummings saw Boyce reach toward the midsection of his body, retrieve a nickel-plated handgun, and toss it over a garage into a yard. The officer caught up with Boyce soon afterward and detained him. Officers found a silver .357 Magnum handgun in the area where Officer Cummings saw Boyce throw a gun. Officers also found three .357 bullets in Boyce's right front pants pocket after they arrested him.

Boyce was charged with one count of being a felon in possession of a firearm and one count of being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1) and § 924(e)(1). While he was in jail awaiting trial, Boyce sent Portis a letter requesting that she recant her statement that he had a gun. He even provided the language he wanted her to use in a letter he wanted her to write to him:

> It seems like my whole life is going down since I called the police and I lied on you. I didn't know that those police was going to actually put a gun on you. Like I said before, I am so sorry for calling them and lying about you had a gun and hit me, but you just misunderstand how I felt when I saw you and the other girl hugging and kissing … . So the only way I thought of paying

you back was to call the police and get you locked up once again. I'm so sorry.

Boyce and Portis also spoke by telephone while he was in jail, and Boyce said "our story" to which they would stick was that Portis made the whole thing up because she was mad he had been talking to another woman.

Portis did not testify at trial, but the government played a recording of her 911 call for the jury. In arguing that Boyce possessed a firearm on March 27, 2010, the government pointed to Officer Cummings's testimony that he saw Portis throw a gun, other officers' testimony recounting the recovery of the gun in the area and ammunition matching the gun in Boyce's pocket, and Portis's statement on the 911 call that Boyce had a gun. A jury found Boyce guilty on both charged counts. The district court concluded that Boyce had three prior violent felonies or serious drug offenses that mandated a minimum term of fifteen years' imprisonment under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). The court sentenced him to 210 months' imprisonment, two and a half years over the mandatory minimum sentence. Boyce appeals.

## II. ANALYSIS

### A. No Restoration of Civil Rights

Before we consider the admission of Portis's statements in the 911 call, we address Boyce's argument that the indictment against him should have been dismissed. Boyce contends that the district court should have granted his motion to dismiss the indictment for lack of a qualifying predicate felony conviction. We review that decision de novo, and we review the district court's factual findings for clear error. *United States v. Greve*, 490 F.3d 566, 570 (7th Cir. 2007).

Boyce was charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). A prior felony is not a predicate offense for a § 922(g)(1) violation if the defendant "has been pardoned or has had civil rights restored" unless the "restoration of civil rights expressly provides" that the person may not possess firearms. 18 U.S.C. § 921(a)(20). Boyce maintains his civil rights had been restored regarding his prior felony convictions before he possessed the gun and ammunition in this case, and, therefore, that he did not have a predicate felony for purposes of § 922(g)(1).

Boyce was convicted of five state felonies in 1991 and received concurrent prison terms. He was released from prison in 1993 and placed on supervised release. While on supervised release, he was arrested and convicted of unlawful use of a weapon ("UUW"). Because of that conviction, his supervised release on the prior 1991 convictions was revoked, and he returned to prison. The district court found that his sentence on the parole revocation ended on December 23, 1995. Boyce remained in prison, however, because he still had more time to serve on the UUW charge. Boyce completed his prison term on the UUW charge on February 6, 1996 and began a one-year period of supervised release on that charge. He completed that term on February 6, 1997. He then received a form letter informing him of the restoration of his right to vote and to hold state office. Specifically, the letter stated:

> We are pleased to inform you of the restoration of your right to vote and to hold offices created under the constitution of the state of Illinois. You also have the right to restoration of licenses granted to you under the authority of the State of Illinois if such license was revoked solely as a result of your conviction, unless the licensing

> authority determined that such restoration would not be in the public interest.

This form letter that Boyce received was the same form letter we have already held constitutes a restoration of civil rights for purposes of § 921(a)(20). *See Buchmeier v. United States*, 561 F.3d 561 (7th Cir. 2009) (en banc).

That does not end the analysis, however, as the pertinent question is whether the letter restored Boyce's civil rights on all his previous felonies or just on the UUW felony. Unfortunately for Boyce, we have considered and rejected the argument that the letter restored civil rights on all his previous felonies. We said in *United States v. Burnett*, 641 F.3d 894 (7th Cir. 2011), that a letter telling a former prisoner that his civil rights have been restored applies conviction-by-conviction. *Id.* at 896. We concluded in that case that where a defendant finished his sentence for a parole revocation in 1994 but remained in prison on a murder conviction until 1999, the form letter he received after his release in 1999—the same form letter Boyce received—only restored his civil rights on the murder conviction. *Id. Burnett* reached that conclusion despite recognizing that "[i]t may well be that Illinois refrained from sending Burnett letters in 1994 about his [other] convictions because the ongoing custody for the murder conviction meant he could not vote or hold public office." *Id.* at 897. Boyce does not ask us to overturn *Burnett*. He points out that the defendant in *Burnett* spent more time in prison for the new offense after the end of his parole revocation sentence than Boyce, but we do not find that distinction material here.

*Burnett* did suggest that a person who received a restoration letter after serving multiple concurrent sentences that expired on the same day might have his civil rights

restored on all convictions. *Id.* at 896. In light of that, Boyce argues that the district court erred when it relied on an affidavit from the Chief Records Officer for the Illinois Department of Corrections that calculated Boyce's discharge revocation date as December 23, 1995. He contends that his sentence for his five 1991 convictions may have ended as early as mid-September 1995 or as late as "well beyond December 23, 1995." But he offers no evidence that his parole revocation and UUW sentences terminated on the same date, and it is his burden to "produce evidence showing that his civil rights have been restored." *United States v. Foster*, 652 F.3d 776, 791–92 (7th Cir. 2011). We find no clear error in the district court's determination that his sentences did not terminate on the same date, and, following *Burnett*, we affirm the denial of Boyce's motion to dismiss the indictment.

### B. 911 Call Properly Admitted

We next turn to Boyce's argument that the government should not have been allowed to introduce Portis's 911 call at trial. Portis did not testify at trial. The jury still heard her voice, though, as the government played the audio recording of her 911 call during the trial. (The jury received a transcript of the call as well.) The district court admitted Portis's 911 call on the basis that it was a present sense impression under Federal Rule of Evidence 803(1) and an excited utterance under Federal Rule of Evidence 803(2). Boyce maintains that the call does not fall within either of these hearsay exceptions. We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Joy*, 192 F.3d 761, 766 (7th Cir. 1999).

Rule 803(1), the present sense impression exception, provides that "[a] statement describing or explaining an event or condition, made while or immediately after the declarant

perceived it" is not excluded by the rule against hearsay. Rule 803(2) sets forth the exception for an "excited utterance," defined by the rule as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of the excitement that it caused."

The theory underlying the present sense impression exception "is that substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." Fed. R. Evid. 803 advisory committee's note. Along similar lines, the idea behind the excited utterance exception is that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." *Id.* In other words, the statement must have been a spontaneous reaction to the startling event and not the result of reflective thought. 2 McCormick on Evidence § 272 (7th ed. 2013).

But that is not to say the spontaneity exceptions in the Federal Rules of Evidence necessarily rest on a sound foundation. We have said before regarding the reasoning behind the present sense impression that "[a]s with much of the folk psychology of evidence, it is difficult to take this rationale entirely seriously, since people are entirely capable of spontaneous lies in emotional circumstances." *See Lust v. Sealy*, 383 F.3d 580, 588 (7th Cir. 2004) (noting studies showing that less than one second is needed to fabricate a lie) (citing Douglas D. McFarland, *Present Sense Impressions Cannot Live in the Past*, 28 Fla. St. U. L. Rev. 907, 916 (2001)). As for the excited utterance exception, "The entire basis for the exception may … be questioned. While psychologists would probably concede that excitement minimizes the reflective self-interest influencing the declarant's statements, they have questioned whether this might be outweighed by the distorting effect of shock and

excitement upon the declarant's observation and judgement."
2 McCormick on Evidence § 272 (7th ed. 2013).

Nonetheless, we have recognized that despite these issues,
the exceptions are well-established. *See Ferrier v. Duckworth*,
902 F.2d 545, 547–48 (7th Cir. 1990); *see also White v. Illinois*, 502
U.S. 346, 356 n.8 (1992) (describing excited utterance as a
"firmly rooted" exception to the general prohibition against
hearsay). Boyce, while pointing to some of this criticism, does
not ask us to find the exceptions utterly invalid, and so we
proceed to consider his arguments that the exceptions do not
apply in the circumstances of his case.

To take the Rule 803(1) present sense impression exception
first, we have said that to be admissible under this rule, "(1) the
statement must describe an event or condition without
calculated narration; (2) the speaker must have personally
perceived the event or condition described; and (3) the state-
ment must have been made while the speaker was perceiving
the event or condition, or immediately thereafter." *United
States v. Ruiz*, 249 F.3d 643, 646 (7th Cir. 2001). Here, Portis was
personally present during the domestic battery she recounted
during the 911 call. The questions here are whether Portis's
statements were made without calculated narration and
whether her 911 call was sufficiently contemporaneous to
constitute a present sense impression.

To take the timing issue first, while Portis did not call 911
as Boyce was hitting her, nor would that have been feasible or
wise to do, the Advisory Committee's Note to Federal Rule of
Evidence 803 "recognizes that in many, if not most, instances
precise contemporaneity is not possible and hence a slight
lapse is allowable." *See also, e.g., Ruiz*, 249 F.3d at 647
(upholding admission of statements made "shortly after"

observations). Portis's statements to the 911 operator that Boyce had "just" hit her and that she had "just" run upstairs to her neighbor's house indicate that she called 911 nearly immediately after her observations. That timing is consistent with other circuits' interpretation of the present sense impression exception. *See, e.g., United States v. Davis*, 577 F.3d 660, 669 (6th Cir. 2009) (admitting 911 call where caller reported seeing defendant with a gun as present sense impression and excited utterance in § 922(g)(1) case and stating it did not matter whether statements were made thirty seconds or five minutes after witnessing event); *United States v. Shoup*, 476 F.3d 38, 42 (1st Cir. 2007) (finding that statements in 911 call made about one to two minutes after leaving dangerous situation and going into apartment constituted present sense impression and excited utterance).

A statement must also be made without calculated narration to qualify under the present sense impression exception, *United States v. Woods*, 301 F.3d 556, 562 (7th Cir. 2002), and Boyce points out that Portis did not mention a gun until questioned by the dispatcher as to whether Boyce had any weapons. One can still make statements without calculated narration even if made in responses to questions. *Cf. United States v. Thomas*, 453 F.3d 838, 844 (7th Cir. 2006) (admitting 911 call, including responses to operator questions, as present sense impression).[1] Here, notably, when the operator asked

---

[1] The argument that responding to questions precludes the application of a spontaneity exception could also be made with regard to the excited utterance exception, an exception we will turn to next. We note that in the excited utterance context, we have stated that the fact that a declarant "was answering questions, rather than giving a spontaneous narrative, does not indicate that he was not excited when he provided the answers." *Joy*, 192

(continued...)

what kind of weapon, Portis told the operator "a gun." The operator did not ask whether Boyce had a gun; it was Portis who first brought up the gun's presence.

But answering questions rather than giving a spontaneous narration could increase the chances that the statements were made with calculated narration, and, as we discussed, Portis ran to another residence between the battery and her 911 call. We need not definitively decide whether these concerns mean Portis's statements fail to qualify under the present sense impression exception because even if they did, they would still be admissible as an excited utterance. The excited utterance exception "allows for a broader scope of subject matter coverage" than the present sense impression. *United States v. Moore*, 791 F.2d 566, 572 (7th Cir. 1986). This is because the Federal Rules of Evidence provide that an excited utterance includes a statement "relating to" a startling event, Fed. R. Evid. 803(2), while the present sense impression exception is limited to "describing or explaining" the event, Fed. R. Evid. 803(1); *see also Moore*, 791 F.2d at 572.

For the excited utterance exception to apply, we have said that the proponent must demonstrate that: "(1) a startling event occurred; (2) the declarant makes the statement under the stress of the excitement caused by the startling event; and (3) the declarant's statement relates to the startling event." *Joy*, 192 F.3d at 767. The statement "need not be contemporaneous with the startling event to be admissible under rule 803(2) … [r]ather, the utterance must be contemporaneous with the excitement engendered by the startling event." *Id.* at 765 (citation and internal quotation marks omitted); *see also United*

---

[1] (…continued)
F.3d at 767; *see also United States v. Martin,* 59 F.3d 767, 770 (8th Cir. 1995).

*States v. Wesela*, 223 F.3d 656, 663 (7th Cir. 2000) (stating timing of statement important but not controlling and that what matters is whether statement made "contemporaneously with the excitement resulting from the event, not necessarily with the event itself") (citations omitted).

Here, the startling event of a domestic battery occurred. Portis called 911 and reported that Boyce had just hit her and was "going crazy for no reason" and that he had a gun. Next, Portis made her 911 call while under the stress of the excitement caused by the domestic battery. She made the call right after the battery, telling the operator that she had "just" run upstairs to her neighbor's house. Officer Solomon's testimony that Portis appeared emotional, as though she had just been in an argument or fight, further supports the district court's conclusion that Portis made the call while under the stress or excitement of the startling event.

Boyce principally takes issue with the district's court finding that her statements related to the startling event. In particular, he argues that the gun Portis described in the call was not related to the domestic battery she was reporting. Instead, he says, her reference to a gun in the call referred to a separate, earlier time when Boyce possessed a gun.

We do not find an abuse of discretion in the district court's determination that Boyce's statement in the call that she had seen Boyce with a gun was related to the domestic battery. During her call to 911 requesting help from the police, Portis told the operator that Boyce had a gun and responded "Yes!" several times when the operator asked if she had seen it. Upon further questioning she replied that she was "positive." When the dispatcher asked Portis whether any weapons were involved, the dispatcher was trying to obtain information

regarding the battery and the level of danger posed by her assailant. And Portis said a weapon, in particular a gun, was involved. In doing so, Portis provided the dispatcher with information about her assailant and the danger she experienced just minutes before the call. This description of the threat posed by the man who battered her relates to the incident which produced her agitated state.

In addition to stating in the 911 call, and then confirming multiple times, that Boyce had a gun, Boyce stated in response to the government's motion in limine that Portis told the responding officers Boyce had physically assaulted her and that she had witnessed him take a gun from a bedroom dresser before leaving the apartment. Boyce points out that although the probation officer interviewed Portis while preparing the Presentence Report, there is nothing in it that suggests that Portis recounted seeing Boyce with a gun to the probation officer. The district court's decision to allow the account Portis gave in the immediate aftermath of the event, before she had the time to consider the effect it might have on the father of her children (and Boyce's communications to Portis suggest he was trying to influence her), is consistent with the rationale underlying the excited utterance exception. And while corroboration is not required for admissibility, *see Ruiz*, 249 F.3d at 647, here Portis's statement that Boyce had a gun was corroborated by Officer Cummings's testimony that he saw Boyce throw a gun and by the testimony of other officers who recovered the gun and found bullets matching the gun in Boyce's pocket.

Even if Boyce is correct that his gun was not at arms' length while he struck her, if a domestic battery victim in Portis's circumstances knows her assailant has access to a gun nearby, the potential for more lethal force to be used against her would

be a subject likely to be evoked in the description of her assault. *See Moore*, 791 F.2d at 572 (quoting 4 Weinstein Evidence ¶ 803(2)[01] at 803–95 (1985) in explaining excited utterances: "If the subject matter of the statement is such as would likely be evoked by the event, the statement should be admitted."). Under the facts of this case, we find no abuse of discretion in the district court's decision to admit Portis's statements during the 911 call as excited utterances under Rule 803(2).

### C. Enhanced Sentencing Penalty Proper

Boyce also argues that his sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e), was improper because a jury did not find the fact of his prior convictions beyond a reasonable doubt. As support, Boyce points to the Supreme Court's decision earlier this year holding that any fact that increases the mandatory minimum sentence for a crime is an element and must be submitted to the jury and found beyond a reasonable doubt. *Alleyne v. United States*, 133 S. Ct. 2151, 2158 (2013). *Alleyne*, however, did not change the rule announced in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), that the fact of a prior conviction need not be alleged in the indictment or proven to a jury beyond a reasonable doubt. The Court explicitly stated in *Alleyne* that it was not revisiting its *Almendarez-Torres* decision because the parties had not raised it. 133 S. Ct. at 2160 n.1. Until the Supreme Court tells us otherwise, we will continue to apply *Almendarez-Torres*, and so we decline to set aside Boyce's sentence on this ground.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.

POSNER, *Circuit Judge*, concurring. I agree that the district court should be affirmed—and indeed I disagree with nothing in the court's opinion. I write separately only to express concern with Federal Rules of Evidence 803(1) and (2), which figure in this case. That concern is expressed in a paragraph of the majority opinion; I seek merely to amplify it.

Portis's conversation with the 911 operator was a major piece of evidence of the defendant's guilt. What she said in the conversation, though recorded, was hearsay, because it was an out-of-court statement offered "to prove the truth of the matter asserted," Fed. R. Evid. 801(c)(2)—namely that the defendant (Boyce) had a gun—rather than to rebut a charge of recent fabrication or of a recently formed improper motive, Fed. R. Evid. 801(d)(1)(B), by showing that the person making the statement had said the same thing before the alleged fabrication or the formation of the improper motive. 30B Michael H. Graham, *Federal Practice & Procedure* § 7012, pp. 128–45 (interim ed. 2011). But the government argued and the district court agreed that Portis's recorded statement was admissible as a "present sense impression" and an "excited utterance." No doubt it was both those things, but there is profound doubt whether either should be an exception to the rule against the admission of hearsay evidence.

One reason that hearsay normally is inadmissible (though the bar to it is riddled with exceptions) is that it often is no better than rumor or gossip, and another, which is closely related, is that it can't be tested by cross-examination of its author. But in this case either party could have called Portis to testify, and her testimony would not have been hearsay. Neither party called her—the government, doubtless because Portis recanted her story that Boyce had had a

gun after he wrote her several letters from prison asking her to lie for him and giving her detailed instructions on what story she should make up; Boyce, because her testimony would have been likely to reinforce the evidence of the letters that he had attempted to suborn perjury, and also because his sexual relationship with Portis began when she was only 15. Boyce's counsel said "the concern is that if Ms. Portis were to testify, she does look somewhat young and so the jury could infer … that this relationship could have started when she was underage."

To get her recorded statement admitted into evidence, the government invoked two exceptions to the hearsay rule. One, stated in Rule 803(1) and captioned "present sense impression," allows into evidence "a statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." The other—the "excited utterance" exception of Rule 803(2)—allows into evidence "a statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."

The rationale for the exception for a "present sense impression" is that if the event described and the statement describing it are near to each other in time, this "negate[s] the likelihood of deliberate or conscious misrepresentation." Advisory Committee Notes to 1972 Proposed Rules. I don't get it, especially when "immediacy" is interpreted to encompass periods as long as 23 minutes, as in *United States v. Blakey*, 607 F.2d 779, 785–86 (7th Cir. 1979), 16 minutes in *United States v. Mejia-Velez*, 855 F. Supp. 607, 614 (E.D.N.Y. 1994), and 10 minutes in *State v. Odom*, 341 S.E.2d 332, 335–36 (N.C. 1986). Even real immediacy is not a guarantor of

truthfulness. It's not true that people can't make up a lie in a short period of time. Most lies in fact are spontaneous. See, e.g., Monica T. Whitty et al., "Not All Lies Are Spontaneous: An Examination of Deception Across Different Modes of Communication," 63 *J. Am. Society of Information Sci. & Technology* 208, 208–09, 214 (2012), where we read that "as with previous research, we found that planned lies were rarer than spontaneous lies." *Id*. at 214. Suppose I run into an acquaintance on the street and he has a new dog with him—a little yappy thing—and he asks me, "Isn't he beautiful"? I answer yes, though I'm a cat person and consider his dog hideous.

I am not alone in deriding the "present sense impression" exception to the hearsay rule. To the majority opinion's quotation from *Lust v. Sealy, Inc.*, 383 F.3d 580, 588 (7th Cir. 2004)—"as with much of the folk psychology of evidence, it is difficult to take this rationale [that immediacy negates the likelihood of fabrication] entirely seriously, since people are entirely capable of spontaneous lies in emotional circumstances"—I would add the further statement that "'old and new studies agree that less than one second is required to fabricate a lie.'" *Id.*, quoting Douglas D. McFarland, "Present Sense Impressions Cannot Live in the Past," 28 *Fla. State U. L. Rev.* 907, 916 (2001); see also Jeffrey Bellin, "Facebook, Twitter, and the Uncertain Future of Present Sense Impressions," 160 *U. Pa. L. Rev.* 331, 362–66 (2012); I. Daniel Stewart, Jr., "Perception, Memory, and Hearsay: A Criticism of Present Law and the Proposed Federal Rules of Evidence," 1970 *Utah L. Rev.* 1, 27–29. Wigmore made the point emphatically 110 years ago. 3 John Henry Wigmore, *A Treatise on the System of Evidence in Trials at Common Law* § 1757, p. 2268 (1904) ("to admit hearsay testimony simply because it was

uttered at the time something else was going on is to introduce an arbitrary and unreasoned test, and to remove all limits of principle").

It is time the law awakened from its dogmatic slumber. The "present sense impression" exception never had any grounding in psychology. It entered American law in the nineteenth century, see Jon R. Waltz, "The Present Sense Impression Exception to the Rule Against Hearsay: Origins and Attributes," 66 *Iowa L. Rev.* 869, 871 (1981), long before there was a field of cognitive psychology; it has neither a theoretical nor an empirical basis; and it's not even common sense— it's not even good folk psychology.

The Advisory Committee Notes provide an even less convincing justification for the second hearsay exception at issue in this case, the "excited utterance" rule. The proffered justification is "simply that circumstances *may* produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of *conscious* fabrication." The two words I've italicized drain the attempted justification of any content. And even if a person is so excited by something that he loses the capacity for reflection (which doubtless does happen), how can there be any confidence that his unreflective utterance, provoked by excitement, is reliable? "One need not be a psychologist to distrust an observation made under emotional stress; everybody accepts such statements with mental reservation." Robert M. Hutchins & Donald Slesinger, "Some Observations on the Law of Evidence: Spontaneous Exclamations," 28 *Colum. L. Rev.* 432, 437 (1928). (This is more evidence that these exceptions to the hearsay rule don't even have support in folk psychology.)

As pointed out in the passage that the majority opinion quotes from the McCormick treatise, "The entire basis for the [excited utterance] exception may … be questioned. While psychologists would probably concede that excitement minimizes the possibility of reflective self-interest influencing the declarant's statements, they have questioned whether this might be outweighed by the distorting effect of shock and excitement upon the declarant's observation and judgement." 2 *McCormick on Evidence* § 272, p. 366 (7th ed. 2013).

The Advisory Committee Notes go on to say that while the excited utterance exception has been criticized, "it finds support in cases without number." I find that less than reassuring. Like the exception for present sense impressions, the exception for excited utterances rests on no firmer ground than judicial habit, in turn reflecting judicial incuriosity and reluctance to reconsider ancient dogmas.

I don't want to leave the impression that in questioning the present sense and excited utterance exceptions to the hearsay rule I want to reduce the amount of hearsay evidence admissible in federal trials. What I would like to see is Rule 807 ("Residual Exception") swallow much of Rules 801 through 806 and thus many of the exclusions from evidence, exceptions to the exclusions, and notes of the Advisory Committee. The "hearsay rule" is too complex, as well as being archaic. Trials would go better with a simpler rule, the core of which would be the proposition (essentially a simplification of Rule 807) that hearsay evidence should be admissible when it is reliable, when the jury can understand its strengths and limitations, and when it will materially enhance the likelihood of a correct outcome.